# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Dawn M. Ahlstrom,

    Plaintiff,

  vs.        REPORT AND RECOMMENDATION

Michael J. Astrue,
Commissioner of the Social
Security Administration,

     Defendant.   Civ. No. 08-5768 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 405(g) of the Social
Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the
Commissioner's final decision which denied her application for Disability Insurance
Benefits ("DIB"). The matter is now before the Court upon the parties' cross-Motions
for Summary Judgment. The Plaintiff has appeared by Jennifer Mrozik, Esq., and the
Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney. For
reasons which follow, we recommend that the Defendant's Motion for Summary
Judgment be granted, and that the Plaintiff's Motion be denied.

## II. Procedural History

The Plaintiff previously filed for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"), on November 4, 2002, alleging an onset date of March 23, 2001. [T. 110]. After a Hearing, the application was denied by an Administrative Law Judge ("ALJ") on January 4, 2005. [T. 19-33]. The Appeals Council upheld the ALJ's decision, as did the United States District Court, and no appeal was taken from the District Court's Judgment. [T. 498, 871]; see also, Ahlstrom v. Barnhart, Civ. No. 05-2026 (RHK/JJG), Order of August 30, 2006, Docket No. 28.

As pertinent here, the Plaintiff again applied for DIB, and SSI, on April 11, 2005, at which time, she alleged that she had become disabled on April 14, 2001. [T. 498, 554, and 865]. The Plaintiff met the insured status requirements at the alleged onset date of disability, and she remained insured for DIB through June 30, 2005. [T. 499]. The ALJ evaluated the Plaintiff's disability from January 5, 2005, the day after the ALJ's decision in the previous case, thereby denying any reopening of her prior claim. [T. 498]. "[C]ourts generally lack jurisdiction to review the Commissioner's refusal to reopen the proceeding because a refusal to reopen the proceeding is not a 'final decision of the Commissioner * * * made after a hearing.'" Efinchuk v. Astrue,

480 F.3d 846, 848 (8th Cir. 2007), quoting Title 42 U.S.C. §405(g), and citing Califano v. Sanders, 430 U.S. 99, 107-08 (1977). The Plaintiff does not challenge the ALJ's refusal to reopen, either on constitutional or other grounds, and therefore, as did the ALJ, we limit our review to the time period beginning on January 5, 2005.

On August 3, 2005, the State Agency denied the claim upon initial review, and upon reconsideration on October 21, 2005. [T. 859-864] The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on November 8, 2007, a Hearing was conducted, at which time, the Plaintiff appeared through her attorney. [T. 868-874]. The Plaintiff did not personally appear because she was assertedly hospitalized at that time. [T. 870-71]. Thereafter, on February 28, 2008, the ALJ issued an unfavorable decision, which concluded that the Plaintiff was not disabled after January 5, 2005, the day after the Plaintiff's previous DIB and SSI applications had been denied, through the date of the ALJ's decision. [T. 498-506]. On March 26, 2008, the Plaintiff filed a request for review, [T. 494], and on August 18, 2008, the Appeals Council denied further review. [T. 490-93]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th

Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); Title 20 C.F.R. §404.981.

### III. The Administrative Record

A.     Factual Background.  The Plaintiff was thirty-nine (39) years old at the time of the Hearing.  [T. 68].  She has a high school education, and one year of college coursework, [T. 574], and she has worked as an electronics assembler, production assembler, machine operator, and an optical goods worker.  [T. 871].  In April of 2001, the Plaintiff underwent a left-sided thoracotomy[1] for esophogeal surgery.  [T. 630].  Since then, the Plaintiff worked briefly at an electronics and cable workshop for approximately six weeks, [T. 556], and then babysat for two children in the summer of 2003, [T. 556].  The Plaintiff has not worked since August 31, 2003.  [T. 571].  The Plaintiff alleges that she has been unable to work full-time, since April 14, 2001, due to her chronic pain resulting from the thoracic surgery, a seizure disorder, a bipolar disorder, a depression disorder, and an anxiety disorder.  [T. 570].

---

[1]A thoracotomy is a "surgical incision into the pleural space through the wall of the chest."  See, Dorland's Illustrated Medical Dictionary, at 1946 (31st Ed. 2007).

1. <u>Medical Records from Before the Previous Denial of Benefits</u>.

As we have noted, we are not empowered to review the previous ALJ's decision of January 4, 2005, but the medical records from that time period are a part of the Record that was considered by the second ALJ, and are relevant to whether the Plaintiff was disabled as of June 30, 2005. See, <u>Hillier v. Social Security Administration</u>, 486 F.3d 359, 365 (8th Cir. 2007)("Especially in the context of a progressive disease or degenerative condition, evidence that is offered as proof of a disability, and not found persuasive by an ALJ in a prior proceeding, may be considered in a subsequent proceeding in combination with new evidence for the purpose of determining if the claimant has become disabled since the ALJ's previous decision."), citing <u>Groves v. Apfel</u>, 148 F.3d 809, 810-11 (7th Cir. 1998); see also, <u>Robbins v. Secretary of Health and Human Services</u>, 895 F.2d 1223, 1224 (8th Cir. 1990), citing <u>Wilson v. Califano</u>, 580 F.2d 208, 211 (6th Cir. 1978). Accordingly, we summarize the relevant records.

On March 26, 2001, the Plaintiff underwent a left-sided thoracotomy for an esophageal myotomy[2] at the Allina Health System Cambridge Medical Center, in

---

[2]A myotomy is "the cutting or dissection of a muscle or of muscular tissue." <u>Dorland's Illustrated Medical Dictionary</u>, at 1244 (31st Ed. 2007).

order to treat esophageal spasms. [T. 225, 231]. On March 10, 2001, the Plaintiff

presented at the Cambridge Medical Center Emergency Department with complaints

of pain in her ribs. [T. 236]. On April 19, 2001, the Plaintiff was seen by Dr. John K.

Cummings for a post-operative visit. [T. 277]. Dr. Cummings prescribed Flexeril[3].

[T. 277]. On April 25, 2001, the Plaintiff was seen by Dr. Stephen M. Winselman at

the Cambridge Medical Center with complaints of sinusitis, anxiety, and pain from her

thoracotomy. [T. 276]. Dr. Winselman prescribed Augmentin,[4] nasal steroids,

Xanax,[5] and Percocet.[6] Id.

On May 14, 2001, the Plaintiff presented at the Cambridge Medical Center

Emergency Department with complaints of rib pain. [T. 240]. She was treated with

---

[3]Flexeril is a "trademark for a preparation of cyclobenzaprine hydrochloride," which is "used as a skeletal muscle relaxant for relief of painful muscle spasms[.]" Dorland's Illustrated Medical Dictionary, at 463 (31st Ed. 2007).

[4]Augmentin is "indicated in the treatment of infections," when caused by sinusitis, among other conditions. Physician's Desk Reference, at 1335 (60th ed. 2006).

[5]Xanax is a "trademark for a preparation of alprazolam," which is a "short-acting benzodiazepine used as an antianxiety agent in the treatment of anxiety disorders and panic disorders." Dorland's Illustrated Medical Dictionary at 55 and 2113 (31st Ed. 2007).

[6]Percocet is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, at 1126 (62nd ed. 2008).

an intravenous dose of Phenergan.[7]   [T. 241].   On June 5, 2001, the Plaintiff participated in physical therapy at the Hennepin County Medical Center, and was prescribed a transcutaneous electrical nerve stimulation device ("a TENS unit").  [T. 244, 243].   The Plaintiff reported that she was taking Xanax, Percocet, and had a hormone patch. [T. 246].  On October 23, 2001, the Plaintiff presented with sinusitis at the Cambridge Medical Center Emergency Department.  [T. 248-49].

On March 5, 2002, the Plaintiff underwent a tonsillectomy. [T. 252].  On March 11, 2002, the Plaintiff presented at the Cambridge Medical Center with complaints of pain following a tonsillectomy, and dehydration.  [T. 250-51].  She was admitted for rehydration and pain control.  [T. 251].  At discharge, she was prescribed Percocet for pain, and instructed to follow up in one week.  [T. 250].

On July 18, 2002, the Plaintiff was seen by Dr. Lou J. Sonstegard at the Cambridge Medical Center for leg pain due to a recent injury. [T. 265-66].  Dr. Sonstegard prescribed Percocet, and recommended that she follow up with a physician

---

[7]Phenergan is a "trademark for preparations of promethazine hydrochloride," which has "marked antihistaminic activity as well as sedative and antiemetic actions," and is "used to provide * * *sedation."  Dorland's Illustrated Medical Dictionary, at 1448 and 1549 (31st Ed. 2007).

in seven (7) to ten (10) days. [T. 265]. On September 3, 2002, the Plaintiff was seen by Dr. Paul S. Sanders, who prescribed Flexeril for her back spasms. [T. 264].

On October 23, 2002, the Plaintiff presented with abdominal pain at the Cambridge Medical Center, and was seen by Dr. Kim J. Williams. [T. 253-54]. Dr. Williams noted that the Plaintiff complained of chronic chest wall pain, that she was a "pleasant female," that she sat upright in bed, and appeared well. [T. 253]. Dr. Williams diagnosed acute cystitis with pain, and prescribed Ciprofloxacin,[8] and Percocet for pain. [T. 254].

On December 18, 2002, the Plaintiff was seen by Dr. Gail M. Lundeen at the Cambridge Medical Center, with complaints of chronic pain at the sites of her surgical scars, from her previous surgeries. [T. 257]. On November 26, 2002, the Plaintiff was seen by Bob Bendickson, Registered Physicians Assistant, and Dr. Robert M. Patten, complaining of pain in her left chest wall. [T. 260]. During the office visit, the Plaintiff was sitting, leaning slightly forward, and holding her chest wall. Id. The Plaintiff was advised to continue with the TENS unit, and she was prescribed Ultracet[9]

---

[8]Ciprofloxacin is indicated for "the treatment of infections." Physician's Desk Reference, at 2934 (62nd ed. 2008).

[9]Ultracet is "a centrally acting synthetic opioid analgesic," that is indicated for
(continued...)

for the pain.  Id.  On December 31, 2002, the Plaintiff was seen by Dr. Sanders, for chronic pain and a recent manic episode. [T. 259].  Dr. Sanders recommended that the Plaintiff continue using Flexeril for muscle spasms and pain, and that she obtain a psychiatric consultation. Id.

On January 30, 2003, the Plaintiff met with Dr. William Rodman at the Allina Medical Clinic Ramsey, in order to establish care, and at that time she complained of chronic back and chest wall pain, chronic anxiety, and recurrent urinary tract infections.  [T. 319].  Dr. Rodman advised the Plaintiff to keep a scheduled appointment with a psychiatrist, and opined that it would be necessary to first deal with the Plaintiff's mental impairments before moving to the chronic pain. Id.

On February 3, 2003, the Plaintiff was seen by Dr. William W. Brauer, on a referral from Dr. Sanders, to discuss her psychological health.  [T. 362].  Dr. Brauer recommended that the Plaintiff take a Minnesota Multiphasic Personality Inventory exam ("MMPI"). Id.  On February 19, 2003, the Plaintiff completed an MMPI-2 with Bryan Bartels, Ph.D., at the Cambridge Medical Center. [T. 359].  Dr. Bartels determined that the profile was not valid, but indicated malingering or, more likely,

---

[9](...continued)
the short-term management of acute pain.  Physicians' Desk Reference, at 2462-63 (60th Ed. 2006).

a "cry for help," and he recommended repeating the exam when the Plaintiff had stabilized. Id.

On February 23, 2003, the Plaintiff met with Dr. James B. Long at the Allina Medical Clinic Ramsey, with complaints of facial pain. [T. 322]. Dr. Long diagnosed facial pain syndrome, and ordered a refill of the Plaintiff's Percocet prescription. Id. On March 12, 2003, the Plaintiff was seen by Dr. G. B. Renier at the Cambridge Medical Center for "out of control" left-sided rib pain. [T. 357]. Dr. Renier prescribed Percocet, but instructed the Plaintiff that she would need to get in touch with her primary care physician if she needed refills of that prescription. Id.

On April 14, 2003, the Plaintiff was seen by Dr. Jeffrey Nipper, complaining of shoulder pain and right arm pain. [T. 386]. Dr. Nipper opined that there may be ulnar neuropathy, and ordered an electromyography test to determine how to proceed. Id. On April 16, 2003, the Plaintiff was seen by Dr. Rodman for shoulder pain, and reported a recent injury to a scar on her shoulder. [T. 385]. Dr. Rodman prescribed Endocet[10] for the pain. Id. On April 19, 2003, the Plaintiff was seen by Dr. Christopher Gordon, with complaints of shoulder pain from her recent injury. [T.

---

[10]Endocet is the "trademark for a combination preparation of oxycodone hydrochloride and acetaminophen," which is an analgesic. Dorland's Illustrated Medical Dictionary at 625 and 1377(31st Ed. 2007).

383]. Dr. Gordon noted a decreased range of motion in the Plaintiff's shoulder, and prescribed Ultracet with no refills. Id. On May 7, 2003, the Plaintiff had a follow-up with Dr. Nipper. [T. 380]. Dr. Nipper noted that surgery was not required, but recommended that the Plaintiff purchase an elbow pad from a sporting goods store so as to prevent her elbow from flexing during sleep. Id.

On May 12, 2003, the Plaintiff was seen by Dr. Rodman for severe dental pain. [T. 379]. On May 22, 2003, the Plaintiff was seen by Dr. Long for tooth pain, and she requested Percocet. [T. 375]. Dr. Long ordered a refill of the prescription, after calculating with the Plaintiff exactly how much would be needed. Id. Upon discovering that the Plaintiff had filled a Percocet prescription the day before, from an outside physician, Dr. Long noted that he would not see the Plaintiff again, as he believed that she had obtained the prescription under false pretenses. [T. 376].

Dr. Charles T. Grant, a State Agency physician, completed an Assessment Report, which evaluated the Plaintiff's residual functional capacity ("RFC") in light of her chronic pain, dated May 14, 2003. [T.332]. RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks. See, Title 20 C.F.R. §§404.1545, and 416.945, and Social Security Ruling 96-8p. In his evaluation,

Dr. Grant concluded that the Plaintiff was capable of "medium" work. [T. 327]. A State Agency psychiatrist completed an assessment on February 18, 2003, and concluded that the Plaintiff did not meet any of the Listings. [T. 335-347]. Another State Capacity Assessment, which is dated June 2, 2003, concluded that the Plaintiff was moderately limited in the areas of understanding detailed instructions, maintaining attention and concentration for an extended period, the ability to complete a normal workday without interruptions from psychologically based symptoms, and the ability to respond appropriately to changes in a work setting. [T. 349-50].

On October 6, 2003, the Plaintiff was seen by Dr. Kenneth B. Hoj, who practices with the Cambridge Medical Center, for a consultation regarding an abnormal EEG, and a suspected seizure. [T. 354]. Dr. Hoj reported that the episode had not been a seizure, but he recommended an MRI. [T. 355]. Dr. Hoj observed that the Plaintiff was alert and oriented, with fluent speech, good naming, repetition, and comprehension, and memory of two (2) of three (3) objects after ten (10) minutes. Id. He also noted that the Plaintiff had good motor strength in her neck, and in her lower extremities. Id. Her coordination was normal, and sensation was equal to light touch, and double simultaneous stimulation, but that her position sense and vibratory sense were mildly decreased bilaterally at her ankles. Id. On October 1, 2003, the Plaintiff

underwent an MRI of her brain, which was determined to be within normal limits. [T. 467].

On November 6, 2003, the Plaintiff experienced an episode of fainting, at the Allina Medical Clinic, that immediately followed a cortisone shot in her left shoulder for pain. [T. 367, 369]. She was transferred to the emergency department at Mercy Hospital. [T. 367, 396]. Dr. Robert Thomas examined the Plaintiff, and determined that the fainting had resulted from a vagal reaction to the injection, rather than a seizure. [T. 396-97]. Dr. Thomas discharged the Plaintiff, and prescribed Vicodin[11] for pain. [T. 397].

On November 20, 2003, the Plaintiff was seen by Dr. Donald J. Grossbach, at the Cambridge Medical Center, "with an exacerbation of a neuropathy that she has had for the past few years," and that had resulted from her thoracotomy. [T. 452]. Dr. Grossbach prescribed Percocet for the pain. Id.

On January 5, 2004, the Plaintiff was seen by Dr. Hoj, in order to follow up on the fainting spell of November 6, 2003. [T. 441]. Dr. Hoj prescribed the Plaintiff

---

[11]Vicodin is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, at 510 (62nd ed. 2008).

Trileptal[12] in order to control the seizure activity, and Percocet for the shoulder pain she experienced from striking her shoulder as she fell. [T. 440]. On January 22, 2004, the Plaintiff was seen at the Noran Neurological Clinic for a sleep-deprived eletroencephalogram ("EEG"). [T. 412]. The result was moderately abnormal. [T. 412]. On February 21, 2004, the Plaintiff underwent an MRI of her brain. [T. 459]. Dr. John W. Steely evaluated the MRI, and determined that it was within normal limits. Id.

On April 7, 2004, Dr. Douglas J. Praus referred the Plaintiff to another psychiatrist, and recommended that she start counseling. [T. 425]. Dr. Praus had been treating the Plaintiff for more than one (1) year, and he felt that he had not been able to help her. Id.

On June 16, 2004, the Plaintiff presented at the Cambridge Medical Center Same Day Clinic with acute sinusitis. [T. 420]. Among other medications for the infection, she was prescribed Percocet for sinus pain. Id.

---

[12]Trileptal is the "trademark for a preparation of oxcarbazepine," which is "an anticonvulsant used in the treatment of partial seizures." Dorland's Illustrated Medical Dictionary, at 1997 and 1376 (31st Ed. 2007).

2.    Medical Records on Chronic Pain After the Previous Denial of
      Benefits.

On November 18, 2004, the Plaintiff underwent an evaluation at the Medical Advanced Pain Clinics ("MAPS"), with Dr. Thomas G. Cohn, and Lisa Finely ("Finely"), who is a Certified Nurse Practitioner, and who prepared the report from that evaluation.  [T. 594, 601].  The Plaintiff was referred to Dr. Cohn by Dr. Rodman.  [T. 594].  The Plaintiff complained of thoracic back pain on her left side, pain in her chest on the left side, and shoulder pain on her left side, and she described the pain as a nine (9) on a scale of one (1) to ten (10).  [T. 594].  The Plaintiff reported a slight strain on her family and social relationships, due to her chronic pain.  [T. 596]. The Plaintiff admitted to the previous use of recreational drugs, but had abstained from that use for more than one (1) year, and she denied chemical dependency.  Id. The Plaintiff admitted to smoking one (1) pack of cigarettes per day for the past twenty-four (24) years.  Id.  The Plaintiff reported some success in managing her pain with Percocet, Tylenol 3,[13] Trileptal, and Tylenol.  [T. 594].  The Plaintiff stated that

---

[13]Tylenol 3, or Tylenol with Codeine No. 3, is "indicated for the relief of mild to moderately severe pain."  Physician's Desk Reference, at 2366 (62nd ed. 2008).

she experienced some success, but had some side effects from Morphine,[14] Flexeril, Valium,[15] and Xanax.  Id.  The Plaintiff reported prescriptions for Trileptal, Flexeril, and Xanax.  [T. 595].

Dr. Cohn conducted a physical exam, wherein he examined the Plaintiff for constitutional, general, neurological, musculoskeletal, gastrointestinal, head, eyes, ears, and throat, cardiopulmonary, and skin conditions.   [T. 596-600].  Dr. Cohn found all to be normal, with the exception of the Plaintiff's right hand, which she stated that she had recently injured, and her left upper abdomen, which was tender to palpation.  Id.  Dr. Cohn also noted that the Plaintiff frequently grimaced.  [T. 596]. Most pertinent to this case, Dr. Cohn found that the Plaintiff had a normal range of motion in her spine and joints, no muscle tenderness, no spine tenderness, and a normal sensory exam.  [T. 596-99].  In his assessment, Dr. Cohn concluded that the Plaintiff's pain behaviors, during that clinic visit, were "inconsistent with the objective findings," and that the Plaintiff was "overly dramatic in presentation."  [T.

---

[14]Morphine is "an opioid analgesic having powerful analgesic action * * * for relief of severe pain."  Dorland's Illustrated Medical Dictionary, at 1199 (31st Ed. 2007).

[15]Valium is "indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety."  Physician's Desk Reference, at 2765 (62nd Ed. 2008)

600]. Dr. Cohn referred the Plaintiff to the Chronic Pain Program. <u>Id.</u> Dr. Cohn also concluded that the Plaintiff was not a good candidate for pain management with opioid treatment. <u>Id.</u> Dr. Cohn assessed the Plaintiff with chronic anxiety disorder, depression, irritable bowel syndrome, history of rectal bleeding, and persistent pain in the left shoulder, mid back, and chest. <u>Id.</u>

On November 19, 2004, the Plaintiff was seen by Dr. Grossbach for a reevaluation of the injury to her right hand. [T.643]. Dr. Grossbach noted, upon removal of the plaster splint, that there was a significant amount of swelling. <u>Id.</u> Dr. Grossbach reported that he wrote a refill for oxycodone[16] for pain, but he did not specify the dosage. <u>Id.</u>

On November 24, 2004, the Plaintiff was seen by Dr. Grossbach for a re-evaluation of the injury to her right hand. [T. 642]. Dr. Grossbach noted that she reported some discomfort with active movement of her fingers and thumb, but that she was able to resist pressure in both the flexion and extension of her fingers, indicating no tendon damage. <u>Id.</u> Dr. Grossbach re-wrapped her hand, and prescribed thirty (30) oxycodone tablets, as the Plaintiff reported she was taking one and one-half tablets

---

[16]Oxycodone is "an opioid agonist analgesic derived from morphine." <u>Dorland's Illustrated Medical Dictionary</u>, at 1377 (31st Ed. 2007).

every three (3) to four (4) hours for the pain, and had only fifteen (15) left from the previous prescription, for fifty (50) tablets, given five (5) days before.  Id.

On December 3, 2004, the Plaintiff was again seen by Dr. Grossbach for the injury to her right hand.  [T. 641].  Dr. Grossbach noted that her hand was somewhat swollen, but had significantly subsided.  Id.  He did not prescribe any medications. On that same date, x-rays of the Plaintiff's hand showed that the bone structures, joint spaces, and alignment were all normal. [T. 647].

In a Patient Note dated April 13, 2005, Dr. Grossbach reported that Dr. Murray McAllister, who was the physician who operated MAPS, called Dr. Grossbach to inform him that the Plaintiff had been referred to MAPS for chronic pain, and that the Plaintiff was planning to enroll in a four-week pain management program with the goal of moderating pain, and reducing narcotic use.  [T. 639].  Dr. McAllister was informing the Plaintiff's physicians of her involvement in the program, in order to limit her sources of analgesic prescriptions.  Id.

On June 30, 2005, the Plaintiff met with Dr. Patrick J. Hanna to establish a care regimen.  [T. 637].  Dr. Hanna took a medical and social history, noting that the Plaintiff had been "on disability" since her thoracotomy for esophageal surgery in 2001.  Id.  Dr. Hanna noted that the Plaintiff reported her medications as Flexeril,

oxycodone, Xanax, hyoscyamine,[17] and loratadine.[18]  Id.  The Plaintiff also reported that she had developed a seizure disorder in 2003, but had not experienced any seizures since beginning her treatment with Trileptal.  Id. Dr. Hanna observed that the Plaintiff was an "alert female who [was] in no acute distress," and noted that the Plaintiff reported her pain level at a six (6) to seven (7) out of ten (10).  Id. Dr. Hanna did not examine the Plaintiff, id., but prescribed thirty (30) Percocet, to be used as needed and to last approximately thirty (30) days, for her chronic pain, and Flexeril for her neck pain.  Id.  Dr. Hanna assessed the Plaintiff with chronic pain related to thoracotomy, anxiety, neck pain, a seizure disorder, irritable bowel syndrome, and allergic rhinitis.  Id.

Dr. Jane M. Achenbach, with the Allina Medical Clinic Cambridge, saw the Plaintiff on July 13, 2005, in consultation with Dr. Hanna, concerning the Plaintiff's seizure disorder.  [T. 634].  The Plaintiff reported that she had been taking Trileptal for her seizures, and that she had not experienced any seizures since beginning that

---

[17]Hyoscyamine is "used primarily as an antispasmodic for gastrointestinal or urinary tract disorders."  Dorland's Illustrated Medical Dictionary, at 897 (31st Ed. 2007).

[18]Loratadine is "used for the treatment of allergic rhinitis," among other conditions.  Dorland's Illustrated Medical Dictionary, at 1089 (31st Ed. 2007).

medication. Id. Dr. Achenbach noted that the Plaintiff was also taking Xanax, Flexeril, and oxycodone, hyoscyamine, and loratadine. Id. Dr. Achenbach performed a physical examination, and observed that the Plaintiff was well groomed, sitting in a chair, and in no acute distress. Id. Dr. Achenbach observed that the Plaintiff's station and gait were normal, and that she had "quite good strength" in her upper and lower extremities. [T. 635]. Dr. Achenbach reported that the Plaintiff had normal bulk, normal tone, and no abnormal movements in her muscoloskeletal system. Id. In her neurological examination, Dr. Achenbach observed that the Plaintiff was awake, alert, oriented, and that her attention and concentration were normal. Id. Dr. Achenbach further observed that the Plaintiff's language, memory, and fund of knowledge, were normal. Id.

In her assessment, Dr. Achenbach diagnosed epilepsy, migraines, and chest pain, and she noted that the EEG of the Plaintiff was abnormal, with sharp theta activity over the left hemisphere. [T. 635-36]. Dr. Achenbach reported that the Plaintiff's MRI scan had returned normal. [T. 635, 738]. Dr. Achenbach increased the dosage for Trileptal, recommended that the Plaintiff take one aspirin daily for her migraines, and noted that she would like to see the Plaintiff on a yearly basis. [T. 635-36].

On October 18, 2005, the Plaintiff was seen by Dr. John M. Ruddy at the Cambridge Medical Center, for her complaints of chronic pain. [T. 630]. Dr. Ruddy noted that the Plaintiff had been seen by Dr. Hanna, and prior to that, by Dr. Grossbach, and that she was last seen in June of 2005. Id. The Plaintiff reported that she had attempted to go to MAPS, but that her insurance did not cover those services, and the cost was prohibitive. Id. The Plaintiff reported that Dr. Achenbach was treating her for her seizure disorder, and that she was taking Trileptal. Id. The Plaintiff also reported that she had been on disability since 2001. Id. The Plaintiff told Dr. Ruddy that her energy level was good, but that her pain brought her mood down somewhat. Id. The Plaintiff reported that the pain was located along her left side, and radiated to her back. Id. Dr. Ruddy observed that the Plaintiff was alert and oriented, and in no acute distress. Id. He also observed that she was somewhat anxious. Id. Dr. Ruddy referred the Plaintiff to Abbott Northwestern's Allina Pain Clinic, and he prescribed Percocet, Xanax, and Flexeril. Id. Dr. Ruddy assessed chronic pain, a seizure disorder, and an ingrown nail on her left toe. [T. 630-31].

On November 14, 2005, the Plaintiff saw Dr. Ruddy for her annual physical exam. [T. 628]. The Plaintiff reported that she exercised very little due to her chronic pain, and that she did not believe that she could exercise. Id. In his examination, Dr.

Ruddy observed that the Plaintiff was "alert and orientated," and in no acute distress. Id.  Dr. Ruddy also observed that the Plaintiff's strength and sensation were grossly intact, and that her mood was "upbeat and happy."  Id.  Dr. Ruddy diagnosed the Plaintiff with Hyperlipidemia,[19] and prescribed Lipitor. [T. 629].  He did not prescribe any other medications.

On December 19, 2005, the Plaintiff was seen by Dr. Matthew R. Monsein at the Allina Hospitals and Clinics' Chronic Pain Management Clinic at Abbott Northwestern.  [T. 683-84].  Dr. Monsein diagnosed the Plaintiff with a chronic pain syndrome, drug abuse with overt seeking behavior, a tooth fracture, anxiety, neuralgian, neuritis, and radiculilitis, and opioid dependence.  [T. 684].  Dr. Monsein noted that the Plaintiff reported that she had a longstanding history of flank pain, after her thoracic surgery, and that she had been treated by Dr. Ruddy, and that Dr. Achenbach had completed a pain management program through the Hennepin County Medical Center, physical therapy, a trial with a TENS unit, as well as cortizone injections, and a series of injections with an anesthesiologist, but that she continued to experience continuous pain varying between an eight (8) and a ten (10) out of ten

---

[19]Hyperlipidemia is "elevated blood lipids," that is, high cholesterol.  See, Dorland's Illustrated Medical Dictionary, at 903 (31st Ed. 2007).

(10).  [T. 685].  Dr. Monsein noted that the Plaintiff had a history of seizures, for which she was taking Trileptal, and was being treated by Dr. Achenbach.  Id.  Dr. Monsein listed the Plaintiff's reported medications as Xanax, Flexeril, a treatment for irritable bowel syndrome, Lipitor, Lamictal, and oxycodone.  Id.  Dr. Monsein also noted that the Plaintiff was not working, and that she had not been able to work since the surgery of 2001.  [T. 685-86].

Dr. Monsein completed a physical examination of the Plaintiff.  [T. 686].  In that examination, Dr. Monsein observed that the Plaintiff had marked tenderness over the scar area from her thoracotomy, "with some almost allodynia[20] or hyper-sensitivity."  Id.  Dr. Monsein reported that the remainder of the Plaintiff's neurologic exam was unremarkable, and that she had a good range of motion in her cervical and lumbar spine.  Id.  Dr. Monsein observed that the Plaintiff's cranial nerves were intact, her reflexes equal and symmetric, and that he observed no gross motor or sensory deficits.  Id.  In his discussion of the visit, Dr. Monsein wrote, "I have taken the opportunity at this point to refer [the Plaintiff] back to Dr. [Kristen] Zeller, an interventional pain anesthesiologist, to see if she has anything further to offer her."

---

[20]Allodynia is "pain resulting from a non-noxious stimulus to normal skin." Dorland's Illustrated Medical Dictionary, at 52 (31st Ed. 2007).

Id. Dr. Monsein noted that Cymbalta[21] and Neurontin,[22] in addition to narcotics, would be possible treatment choices, and that the Plaintiff should follow-up in six (6) to eight (8) weeks. Id. Dr. Monsein also wrote that an MRI may be a good idea, in order to rule out "the unlikely possibility that some of [the Plaintiff's] symptoms may be related to a thoracic disc herniation." Id.

On February 25, 2006, the Plaintiff presented at the Cambridge Medical Center Emergency Department with back pain following a nerve block. [T. 810]. The Plaintiff rated her pain as a ten (10) out of ten (10) to the triage Nurse. [T. 811]. At that time, the Plaintiff listed her medications as Percocet, Flexeril, Xanax, Trileptal, a sulfate, and Lipitor. [T. 813]. The physician observed that the Plaintiff was alert, and in moderate to severe distress. [T 815]. The physician reported that the Plaintiff was oriented, with a normal affect, and with no motor or sensory deficits. Id. The Plaintiff was treated with Dilaudid,[23] Phenergan, and Ativan. [T. 815]. At discharge,

---

[21]Cymbalta is "indicated for the treatment of major depressive disorder." Physician's Desk Reference, at 1792 (62nd Ed. 2008).

[22]Neurontin is indicated for the management of post-therapeutic neuralgia in adults. Physician's Desk Reference, at 2463 (62nd Ed. 2008).

[23]Dilaudid is "indicated for the management of pain in patients where an opioid analgesic is appropriate." Physician's Desk Reference, at 420 (62nd Ed. 2008).

the physician prescribed Percocet, and recommended that the Plaintiff follow up with Dr. Ruddy. [T. 815].

On March 3, 2006, the Plaintiff saw Dr. Ruddy with complaints of chronic pain and hyperlipidemia. [T. 627]. The Plaintiff reported that she had gone to MAPS, and had received a nerve block on February 23, 2006, but that she had experienced extreme pain as a result. Id. The Plaintiff related that she had returned to her baseline pain level. Id. The Plaintiff denied any neurologic deficits, numbness, weakness, or tingling in her legs, torso and arms. Id. Dr. Ruddy examined the Plaintiff, and found that she had no lower extremity edema, and that her back was diffusely painful with no specific point tenderness. Id. Dr. Ruddy observed that the Plaintiff moved slowly, but with a good range of motion. Id. In regard to the Plaintiff's chronic pain, Dr. Ruddy prescribed Percocet, but advised the Plaintiff to "tell her pain doctor that she needs a prescription from her for the rest of her pain medication" in order to avoid over-prescribing. [T. 627, 804]. On April 4, 2006, the Plaintiff's prescriptions for Xanax and Flexeril were refilled. [T. 803].

On March 8, 2006, Dr. Kristen Zeller, from the Midwest Spine Institute, wrote a Letter of Medical Necessity that requested pre-approval for the implantation of an ANS Neurstimulation System for the treatment of the Plaintiff's chronic pain. [T.

676]. In the letter, Dr. Zeller wrote that the Plaintiff was a good candidate for a spinal cord stimulation trial and, if the trial proved successful, for an implantation. <u>Id.</u> Dr. Zeller noted that the Plaintiff experienced severe burning pain along the left side of her chest wall, that the Plaintiff tended to be very sensitive to medications, and that the medications she had tried did not produce significant benefit. <u>Id.</u> Dr. Zeller also wrote that she had attempted intercostal injections with the Plaintiff, without long-term benefit. <u>Id.</u> Dr. Zeller wrote that "[the Plaintiff's] function ha[d] declined significantly since having this pain syndrome and she desires to return to a more functional life and work." <u>Id.</u>

As related by Dr. Zeller, spinal cord stimulation is "one of the most successful tools to treat this neuralgic pain disorder." <u>Id.</u> Dr. Zeller wrote that her recommendation was for the neurostimulation screening test, which would determine whether an implantation would be feasible. <u>Id.</u> Finally, Dr. Zeller requested confirmation that the procedure, and the attendant costs, would be covered. <u>Id.</u> There are no other records from Dr. Zeller in the Record, and there is not a copy of the letter from the Social Security Administration to the Midwest Spine Institute requesting records, although the List of Exhibits discloses Dr. Zeller's letter, and the report of

Georgia E. Panopoulos, Ph.D., L.P., as the only medical records from the Midwest Spine Institute covering the period from March 8, 2006, to May 7, 2007. [T. 7C].

Dr. Zeller referred the Plaintiff to Dr. Panopoulos, who saw the Plaintiff on May 22, 2006, at the University of Minnesota Medical Center, Pain Management Center. [T. 678-79]. Dr. Panopoulos noted that the Plaintiff reported her chronic pain resulted in a complete interference with her functional activities, including self-care, household chores, and outdoor chores, that her mood adjustment and coping were compromised, and that she was unable to reactivate interpersonally, socially, recreationally, and vocationally. [T. 679].

In her report, Dr. Panopoulos observed that the Plaintiff was casually dressed and groomed, alert, and oriented. [T. 680]. Dr. Panopoulos found the Plaintiff to be cooperative, a reliable historian, and forthcoming with her psychiatric distress. Id. Dr. Panopoulos described the Plaintiff's mood as anxious and depressed, and her affect as reactive. Id. Dr. Panopoulos observed that the Plaintiff's speech and language were of a normal rate, rhythm, and volume, and that her thought form was linear and goal directed, and focused on psychiatric as well as physical distress. Id. Dr. Panopoulos observed that the Plaintiff's attention and concentration were sustained, and her insight was relatively intact. Id.

In her assessment, Dr. Panopoulos noted that the Plaintiff was "delightful" and "motivated in terms of wanting to get her life back." Id. Dr. Panopoulos recommended more aggressive treatment of the Plaintiff's emotional distress, and opportunities for the Plaintiff to learn non-pharmalogical and non-medical approaches to managing her psychiatric and medical distress. [T. 680-81]. Dr. Panopoulos also recommended a psychiatric consultation in order to continue an assessment of the Plaintiff's anxiety, and reported that the Plaintiff was concerned her prescription for alprazolam was becoming less effective. [T. 681]. Dr. Panopoulos assessed the Plaintiff with a pain disorder associated with psychological features and general medical condition; an anxiety disorder; rule out attention deficit disorder; dependant personality features possibly consequent to chronicity of pain syndrome; chest wall pain, left-sided, status post thoracotomy; pain and physical limitations at a young age; significant and perhaps under-treated anxiety and depression. [T. 681]. Dr. Panapoulus assessed the Plaintiff's Global Assessment of Functioning ("GAF") score at 60.[24] Id.

---

[24]The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34. On a 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in

(continued...)

On June 8, 2006, the Plaintiff was seen by Dr. Ruddy for sinus and facial pain. [T. 626].  Dr. Ruddy referred the Plaintiff to Dr. Achenbach in order to determine if the Plaintiff was suffering from a trigeminal neuralgia, or tic douloureux.  Id.  Dr. Ruddy noted that the Plaintiff had a history of chronic pain, and sought narcotics from him during the office visit, to treat her facial pain.  Id.  Dr. Ruddy noted that he did not believe that the Plaintiff's request for narcotics "was entirely based on her history of chronic pain."  Id.

On June 15, 2006, the Plaintiff was seen by Dr. Achenbach for "spells of right facial pain and also spells of rushing sensation."  [T. 624].  In her Social History of the Plaintiff, Dr. Achenbach noted that the Plaintiff had been disabled since 2001.  Id. In her Review of Systems of the Plaintiff, Dr. Achenbach opined that the Plaintiff was in "quite good health."  Id.  Dr. Achenbach noted that the Plaintiff had displopia in one eye occasionally when experiencing the rushing sensation, that the Plaintiff's head, eyes, ears, and throat, were "significant for the sinus allergic rhinitis issues and

---

[24](...continued)
social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning reasonably well and having some meaningful interpersonal relationships.  Id.

the right nasal symptoms," that the Plaintiff had a history of hyperlipidemia, irritable bowel syndrome, chronic pain, and that her neurologic systems were "significant for the issues above." Id.

Dr. Achenbach examined the Plaintiff, and observed that the Plaintiff was in no acute distress. [T. 625]. In her musculoskeletal exam, Dr. Achenbach observed that the Plaintiff's station and gait were normal, and her motor examination revealed good strength. Id. Dr. Achenbach reported that the Plaintiff's affect was normal, that she had good eye contact, was awake, alert, and oriented, but that her attention and concentration were diminished. Id. Dr. Achenbach also observed that the Plaintiff's language, memory, and fund of knowledge, were normal. Id. Dr. Achenbach completed a sensory examination of the Plaintiff, and observed that the Plaintiff's reflexes were diminished but symmetric, and that her finger-to-nose and heel-to-shin testing was intact. Id. Dr. Achenbach observed that the Plaintiff had no clonus and no spasticity. Id. In her assessment and plan, Dr. Achenbach ordered a check on the Plaintiff's Trileptal level, liver functions, and recommended a lactose-free diet for three (3) months. Id. Dr. Achenbach did not prescribe any medications for the Plaintiff.

On July 17, 2006, the Plaintiff was seen by Dr. Ruddy with follow-up questions from her appointment with Dr. Achenbach. [T. 623]. Dr. Ruddy observed that the Plaintiff was "alert and oriented asking multiple questions," and "in no acute distress." Id. The visit with Dr. Ruddy was focused on answering the Plaintiff's questions regarding the tests that Dr. Achenbach had ordered. Id. Dr. Ruddy refilled the Plaintiff's prescriptions for Flexeril and Xanax, but did not refill her narcotic prescriptions. Id.

Also on July 17, 2006, the Plaintiff underwent an electroencephalogram ("EEG") to monitor her history of seizures. [T. 786]. The EEG was abnormal, and Dr. Achenbach found that it suggested a defect of the left temporal region, raising the possibility of seizure. Id. Dr. Achenbach suggested a clinical correlation. Id.

On November 22, 2006, the Plaintiff was treated in the Emergency Department of the Cambridge Medical Center for lower back pain. [T. 773]. The Plaintiff rated her pain as a nine (9) out of ten (10) to the triage Nurse. Id. In this visit, the Plaintiff listed her medications as oxycodone, Xanax, Flerxeril, Lipitor, Trileptol, and sulfate. [T. 775]. She was given Toradol,[25] Valium, and Dilaudid at the hospital. [T. 774].

_____

[25]Toradol is a "trademark for preparations of ketorolac tromethamine," which is a "a nonsteroidal antiinflammatory drug." Dorland's Illustrated Medical

(continued...)

During his examination, Dr. Steven Clark observed that the Plaintiff was in no acute distress and was alert, but that her speech was slow and slurred. [T. 777]. The physician reported that the Plaintiff was oriented, that her mood and affect were normal, her reflexes were normal, and that she had no apparent motor or sensory deficits. Id. The Plaintiff's pain level at discharge was a seven (7). [T. 774]. In his discharge notes, Dr. Clark prescribed Valium, and advised the Plaintiff to discontinue her use of Flexeril while she was taking the Valium. [T. 772]. Dr. Clark also advised the Plaintiff to increase her Percocet dosage for the next two days, and then return to her usual dose. Id.

On November 27, 2006, the Plaintiff was seen by Dr. Ruddy for complaints of back pain, and a sore on her nose. [T. 620]. The Plaintiff informed Dr. Ruddy that she had recently been to the Emergency Department for her back pain, and that the staff advised her to change her back pain medications. Id. Dr. Ruddy advised the Plaintiff that he would not prescribe medications for her back pain, and that she should return to her "back specialist" at the Midwest Spine Institute to discuss pain management, as he was leaving decisions about pain medication to Dr. Zeller. Id. Dr.

---

25(...continued)
Dictionary, at 1966 and 998 (31st Ed. 2007).

Ruddy noted that the Plaintiff agreed that she should return to Dr. Zeller for medications regarding her back pain. Id.

On January 16, 2007, the Plaintiff met with Dr. Ruddy to discuss insomnia. [T. 619]. Dr. Ruddy noted that the Plaintiff's father had recently passed away, and that the Plaintiff was experiencing significant grief. Id. Dr. Ruddy changed the Plaintiff's Ambien[26] prescription to help her sleep, and discussed non-pharmacologic relaxation techniques. Id. Dr. Ruddy noted that the Plaintiff was tearful and crying, but in no acute distress. Id. He also prescribed Protonix to treat her gastroesophageal reflux disease. Id.

On February 21, 2007, the Plaintiff was examined by Dr. Kymberly Vogt, of the Allina Medical Clinic Cambridge, for pain in her right foot. [T. 616]. In her social history, Dr. Vogt noted that the Plaintiff had recently quit smoking, did not use alcohol, and has been disabled since 2001. Id. Dr. Vogt also noted that the Plaintiff had current prescriptions for Ambien, Lipitor, hycosamine, Flexeril, Xanax, and oxycodone. Id. Dr. Vogt conducted a physical examination, in which she observed that the Plaintiff was "alert and oriented," and "in no apparent distress." [T. 617]. In

---

[26]Ambien is "indicated for the short-term treatment of insomnia characterized by difficulties with sleep initiation." Physician's Desk Reference, at 2799 (62nd Ed. 2008).

her assessment, Dr. Vogt found that the Plaintiff was suffering from metatarsalgia, pes planus, and foot pain. [T. 616]. Dr. Vogt reported that the Plaintiff's right foot was significantly collapsed, as compared to her left foot, and she recommended supportive shoes. [T. 617].

On May 7, 2007, Dr. Ruddy refused a refill of Xanax, indicating that the refill should be ordered by the pain specialist instead. [T. 757]. On May 11, 2007, the Plaintiff saw Dr. Ruddy to discuss treating her anxiety with Xanax. [T. 751-52]. Dr. Ruddy noted that the Plaintiff had chronic back pain, for which she was seeing Dr. Zeller, and that the Plaintiff was taking Percocet for pain, and discussing surgery options with Dr. Zeller. Id. Dr. Ruddy wrote the Plaintiff a prescription for Alprazolam, for anxiety, and stopped her prescriptions for Claritin, Estratest, Flexeril, Flonase, Hyoscyamine, Percocet, Roxicet, Zanax, and Alprozolam. [T.753].

On June 11, 2007, the Plaintiff was admitted to the Cambridge Medical Center Emergency Center for painful, swollen feet. [T. 743]. The Plaintiff rated her pain to the triage Nurse as an eight (8) out of ten (10). She was given "HCT2" and instructions for a low-salt diet. [T. 744]. On June 12, 2007, the Plaintiff was seen by Dr. Mark L. Thayer. [T. 742, 746]. At that time, the Plaintiff listed her medications as Lipitor, Trileptal, Flexeril, a sulfate pill, and Xanax. [T. 745]. The Plaintiff

reported her history of chronic back pain. [T. 747].  In the physical exam, Dr. Thayer noted that the Plaintiff had swelling in her lower extremities.  Id.  He also observed that the Plaintiff was in no acute distress, her sensation and motor functions were intact, that she was oriented, her mood was normal, and that her "CN's" were normal as tested.  Id.  The first entry in the handwritten discharge notes is largely illegible, but appears to recommend that the Plaintiff avoid processed foods.  [T. 742].  Dr. Thayer also prescribed "HCT2 25 g", recommended the Plaintiff weigh herself daily and record her weight, and follow up with Dr. Ruddy.  Id.

On July 23, 2007, the Cambridge Medical Clinic refused refills of the following prescriptions:  Alprazolam, Ambien, Trileptal, Oxycodone, Lipitor, Hydrochlorothiazide,[27] Hyoscyamine Sulfate, and Cyclobenzaprine,[28] [T. 726-27], as those prescriptions had not been renewed.  [T. 726].  On that same day, the Plaintiff was seen by Dr. Ruddy for a yearly review of her medication management.  [T. 727].

---

[27]Hydrochlorothiazide is a diuretic "used for treatment of hypertension and edema."  Id. at 890 (31st Ed. 2007).

[28]Cyclobenzaprine hydrochloride is "used as a skeletal muscle relaxant for relief of painful muscle spasms."  Dorland's Illustrated Medical Dictionary, at 463 (31st Ed. 2007).

As of October 18, 2007, the Plaintiff had the following medications prescribed to her: Alprazolam, aspirin, Lipitor, Flexeril, Cyclobenaprine, Hydrochlorothiazide, Hyoscyamine Sulfate, Trileptal, Oxycodone, Vitamin E Acetate, and Ambien. [T.709]. As of December 12, 2007, the Plaintiff had the same medications prescribed to her. [T. 695].

The Record also contains several handwritten prescription notes. From these notes, it appears that the Plaintiff filled prescriptions for oxycodone on December 7, 2005, and Percocet, Trileptal, Hydrocyamine, Xanax, and Flexeril on January 3, 2006. [T. 827]. The Plaintiff also filled prescriptions for Percocet on February 2, 2006, and February 28, 2006, Lipitor on February 27, 2006, Xanax on February 26, 2006, and Flexeril on March 31, 2006. [T. 820].

3.    Other Medical Records After the Previous Denial of Benefits.

On September 27, 2005, the Plaintiff was seen by Dr. David E. Hovinen at the Allina Medical Clinic Cambridge for vaginal irritation. [T. 632]. On July 28, 2006, the Plaintiff was seen by Dr. Kipton J. Lundquist regarding a previous breast reduction surgery. [T. 622].

On July 10, 2007, the Plaintiff was treated by Dr. Renier at the Cambridge Medical Center for sinus pain and a headache, as well as swelling in her legs and feet.

[T. 609].  Dr. Renier noted that the Plaintiff was "a very pleasant patient in no acute distress."  Id.  He prescribed Augmentin and Vicodin.  [T. 610].

On October 18, 2007, the Plaintiff underwent a colonoscopy, which was performed by Dr. Stanley Dick, at the Cambridge Medical Center, which revealed a benign neoplasm of the rectum.  [T. 700].  The surgical pathology report found "colorectal-type mucosa without significant histologic alteration," and "no evidence of microscopic or other colitis and no neoplastic change" in both specimens.  [T. 712].

4.    Non-Medical Records.

In her Disability Report, which appears to have been dated April 25, 2005 [T. 575], and which was submitted for the most recent applications for benefits, the Plaintiff reported that her ability to work was limited by pain in her left side, a seizure disorder, a bipolar disorder, a depression disorder, and an anxiety disorder.  [T. 570].  The Plaintiff reported that it was difficult for her to move, because movement could cause pain.  Id.  She reported that her ability to work was limited because she must constantly rotate positions, cannot not stand or sit for long periods of time, is in pain all of the time, and tires easily.  [T. 571].  In the Report, the Plaintiff listed Dr. Grossbach, at the Cambridge Medical Center, Dr. McAllister, at the Medical Advanced Pain Specialists, and Dr. Rodman, at the Allina Medical Clinic, as her

doctors.  [T. 573].  She reported her medications as Flexerol for pain, Flonase for Sinuses, Loratadine for Sinuses, a Sulfate Pill to treat Irritable Bowel Syndrome, Trileptal for Seizures, and Xanax for Anxiety.  [T. 574].

As to her work history, the Plaintiff reported that she completed one (1) year of college. Id. She reported that her longest job, which she had held in the past fifteen (15) years, was in an electronics and cable workshop, where she ran a machine which hot-ink stamps serial numbers on electronic cable wires, from September of 2001, to October of 2001.  [T. 571].  She reported that she earned nine dollars ($9.00) per hour and worked forty (40) hours per week.  Id.

In an undated Disability Report, the Plaintiff reported that, since her last Disability Report, the dosage of her seizure medication was increased, that she was directed to take one aspirin per day,  and that she was experiencing more pain in her torso.  [T. 579].  She listed Dr. McAllister, at Medical Advance Pain Specialists, as the doctor she visited for her chronic pain.  [T. 580].  She also listed Dr. Achenbach at the Allina Medical Clinic Cambridge, and "Dr. Hannah [sic]" at the Cambridge Medical Center, as her physicians. [T. 581-82].  She reported her medications as aspirin, extra strength Tylenol, Flexerol, and Percocet for pain, with constipation resulting from the Percocet.  [T. 582].  She reported prescriptions for Flonase and

Loratadine for Sinuses, a Sulfate Pill for Irritable Bowel Syndrome, Trileptal for Seizures, and Xanax for Anxiety. Id.

In the Report, the Plaintiff also gave information about her daily activities. [T. 583]. The Plaintiff reported that she does not shower every day, due to the pain, and that, when she is in a lot of pain, she does not get out of bed. Id. The Plaintiff reported that it takes her longer to shower, because of difficulty bending and reaching. Id. The Plaintiff reported that she always sits to get dressed, that bending to get dressed is painful, that getting dressed takes longer, and that she does not get dressed three (3) or more days per week. Id. The Plaintiff reported that, when she is in a lot of pain, she does not comb her hair, or brush her teeth. Id. The Plaintiff also reported that her fiancé does the cooking, cleaning, laundry, and grocery shopping, which is a reported change since her last Disability Report. Id.

In a second undated Disability Report, the Plaintiff reported that her last Disability Report was completed on September 16, 2005, and that, since then, her chronic pain occurred more frequently. [T. 586]. She also reported a new problem with her foot. Id. According to the Plaintiff, she had begun a chronic pain program at Abbott Northwestern Hospital. [T. 587]. She also listed Dr. Auchenbach, and "Dr. Rutty [sic]," who is with the Allina Medical Clinic Cambridge, as her physicians, and

she reported that her most recent visit was October 18, 2005, and that her next appointment was scheduled for November 14, 2005. [T. 588]. She reported no changes in her medications. [T. 589].

The Record also includes summaries of the Plaintiff's earnings, while she was working. The Plaintiff's FICA earnings for each year range from five hundred eighty-eight dollars and five cents ($588.05) in 1985, to twelve thousand two hundred and fifteen dollars and eighteen cents ($12,215.18) in 1999. [T. 559]. Most recently, the Plaintiff had FICA earnings of seven thousand five hundred fourteen dollars and thirty-five cents ($7,514.35) in 2000, five thousand thirty-nine dollars and thirteen cents ($5,039.13) in 2001, no earnings in 2002, and one thousand eight hundred forty-two dollars ($1,842) in 2003. Id. The Plaintiff reported on her Disability Report that, from September of 2001, to October of 2001, she was employed by Diversified Electronic, Inc., working forty (40) hours per week for hourly wages of nine dollars ($9.00). [T. 571].

B. Hearing Testimony. The Hearing on November 8, 2007, commenced with some opening remarks by the ALJ. [T. 428]. The ALJ asked the Plaintiff's attorney if she had any objections to the evidence for both the current application and the previous application, as well as the SSI file, being introduced into the Record. [T.

870].  The Plaintiff's attorney had no objection, and the ALJ received the files as evidence.  Id.  The ALJ asked the Plaintiff's attorney why the Plaintiff was not present.  Id.  The Plaintiff's attorney explained that she had faxed a letter to the ALJ, earlier that day, and that the Plaintiff was in the hospital for "pain issues."  [T. 870-71].  The ALJ decided to take testimony from the Vocational Expert, L. David Russell ("Russell"), [T. 871], but kept the Record open for thirty (30) days, and requested the Plaintiff to provide more medical records which related to the most recent application, for his review.  [T. 873].

The ALJ then swore Russell to testify, and began his questions by asking him for his view of the Plaintiff's prior work.  [T. 871].  Russell testified that the Plaintiff's work history was essentially the same as it had been at the previous Hearing, excepting the addition of a position as a cashier. [T. 871].  Russell characterized that position as "light and unskilled."  Id.  Russell went on to list the rest of the Plaintiff's work history as an electronic assembler, which is a sedentary, semiskilled position; an assembler; a production assembler, which is a light and unskilled position; a machine operator, which is a medium and semiskilled position; an optical goods worker, which is a sedentary, unskilled position; and a shipping and receiving clerk, which is a medium, skilled position.  Id.

The ALJ then listed the Plaintiff's diagnoses of epilepsy, stenosis of the esophagus, left chest wall pain, and neuropathy, following an esophageal surgery, carpal tunnel syndrome on the right, abdominal pain, irritable bowel syndrome, and impairments of psychological issues, with diagnoses of chronic adjustment disorder with mixed emotional features, and an affective mood disorder. [T. 872]. From the prior decision, the ALJ noted that the previous ALJ had found the Plaintiff's RFC to be sedentary, occasional lifting of ten (10) pounds, frequent lifting of five (5) pounds, minimal stooping, crouching, crawling, climbing, and twisting, no work above dangerous heights, on scaffolds, or ladders, minimal exposure to the sun, and no power gripping, twisting or pounding with the right hand, no over the shoulder work of vigorous pushing or pulling, low-stress work with minimal industrial standards for production and pace, minimal change in work process, and easy access to restroom facilities. Id.

The ALJ listed the positions that the previous ALJ had determined that the Plaintiff was capable of performing: electronic assembler and optical goods assembler. Id. The ALJ then asked Russell if the Plaintiff would still be able to perform in those positions. Id. Russell opined that the best match for the Plaintiff was the optical goods worker position, because it is sedentary and unskilled, and because

it is the position that the Plaintiff had held for the longest time. [T. 872-73]. The ALJ then asked if the Plaintiff had had sufficient time to learn the job, to which Russell responded in the affirmative. [T. 873]. The ALJ also asked Russell how many optical goods worker positions existed, and Russell responded that there were "a couple thousand" in the State of Minnesota. Id. Russell testified that his testimony was not contrary to the Dictionary of Occupational Titles, or the applicable Social Security Administration Regulations. [T. 874]. The ALJ then concluded the Hearing. Id.

C.    The ALJ's Decision.

The ALJ issued his decision on February 28, 2008. [T. 20-30]. As he was required to do, the ALJ applied the sequential, five-step analytical process, that is prescribed by Title 20 C.F.R. §§404.1520, and 416.920.[29] As a threshold matter,

---

[29]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work,
>
> (continued...)

the ALJ noted that, on April 11, 2005, the Plaintiff had filed a protective application for disability and disability insurance benefits, and had retained insured status through June 30, 2005. [T.498]. The ALJ noted that the Plaintiff had not performed any work activity since January 5, 2005. [T. 501]. As a result, the ALJ concluded that the Plaintiff's application could not be denied for substantial gainful activity. Id.

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise her ability to engage in gainful work activity. Id. After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, the ALJ found that the Plaintiff was severely impaired by a history of headaches, a chronic pain syndrome, irritable bowel syndrome, a history of seizure disorder, a post thoracotomy syndrome,

---

[29](...continued)
> the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy. Id. at 754.

a myofascial pain syndrome,[30] a history of carpal tunnel syndrome on the right, a depressive disorder, and an anxiety disorder. [T. 501]. The ALJ based that determination on Dr. Achenbach's treatment notes, which are dated June 15, 2006, and which listed impairments of headaches, chronic pain syndrome, irritable bowel syndrome, history of a seizure in 2003, and anxiety disorder. Id. The ALJ also based his decision on the assessment report of Dr. Cohn, which is dated November 18, 2004, and which listed the Plaintiff's impairments as irritable bowel syndrome, anxiety disorder, depression, and the examination report of Dr. Monsein, which is dated December 18, 2005, and which listed impairments of post thoracotomy syndrome, myofascial pain syndrome, and chronic pain syndrome. Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations. See, Title 20 C.F.R. §404.1520(d). Based upon the Record as a whole, the ALJ determined that the Plaintiff's severe impairments, both physical and mental, did not meet or equal any of the Listings of Impairments. [T. 501]. In particular, the ALJ observed that, with consideration for the "paragraph B" criteria, the Plaintiff's mental impairments did not

---

[30]Myofascial pain syndrome is "caused by tension, fatigue, or spasm in the masticatory muscles." See, The Merck Manual at 865 (18th Ed. 2006).

meet or medically equal the criteria of Listings 12.04, or 12.06.  Id.  The ALJ recited the "paragraph B" requirements, that the mental impairments must result at least two (2) of four (4) criteria:   marked restriction of activities of daily living;  marked difficulties in maintaining social functioning;  marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of an extended duration.  Id.  The ALJ further noted that a "marked limitation" is more than a moderate limitation, but less than extreme.  Id.

The ALJ concluded that the Plaintiff had a mild restriction in the activities of daily living, based on his finding that the Record did not document that the Plaintiff had experienced significant limitations in her ability to perform her activities of daily living, due to her mental impairments.  Id.  The ALJ found that the Plaintiff also had mild difficulties in social functioning, based on her statements during a pain management consultation with Dr. Panopoulos, that she lived with her son, her parents, and her fiancé.  [T. 502].  The ALJ also cited Dr. Panopoulos' evaluation, that the Plaintiff was "delightful" and "cooperative."  Id.

Based upon Dr. Achenbach's treatment notes, and Dr. Panopoulos' assessment report, the ALJ concluded that the Plaintiff had moderate difficulties with regard to concentration, persistence, and pace.  Id.  The ALJ noted that Dr. Achenbach had

stated in her treatment notes of June 15, 2006, that the Plaintiff was alert and oriented, with a normal affect, normal memory, and a normal fund of knowledge, but that her attention and concentration were diminished.  Id.  The ALJ also cited to Dr. Achenbach's treatment notes of July 13, 2005, that the Plaintiff was alert and oriented, that her attention and concentration were normal, her memory was normal, and her fund of knowledge appeared normal as well.  Id.

In addition, the ALJ cited to Dr. Panopoulos's assessment report of May 22, 2006, which stated that the Plaintiff's thought process was goal directed, and that her perception, cognition, and memory, were grossly intact, that her attention and concentration were intact, and that her insight was relatively intact.  Id.  The ALJ noted Dr. Panopoulos' assessment that the Plaintiff had a GAF score of fifty (50) to fifty-five (55), indicating moderate psychological symptoms.  Id.  The ALJ found that the Plaintiff had experienced no episodes of decompensation, and concluded that, because the Plaintiff's mental impairments did not cause at least two (2) marked limitations, or one (1) marked limitation with repeated episodes of decompensation, that the "paragraph B" criteria were not satisfied.  Id.  The ALJ also concluded that the "paragraph C" criteria were not satisfied.  Id.

With respect to the Plaintiff's physical impairments, the ALJ observed that the Plaintiff's seizure disorder was well controlled by her medication, and that she had not experienced seizure activity since 2003. [T. 505]. The ALJ further observed that the Record demonstrated that the Plaintiff had a good range of motion in all of her joints, that her neurological examinations were consistently normal, and that she had good strength and sensation in all of her extremities. Id. The ALJ concluded that the Record demonstrated "minimal objective findings" to support the Plaintiff's symptoms and pain. Id.

At the fourth step, the ALJ also determined that the Plaintiff retained the RFC to engage in the duties required by her past relevant work. [T. 502-05]. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard enunciated in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §§404.1529, and 416.929. [T. 503].

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the State physicians; the objective medical evidence; and the

Plaintiff's subjective complaints of pain; the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has had the residual functional capacity to perform sedentary work; with lifting 10 pounds occasionally and 5 pounds frequently; standing and walking for up to two hours out of an eight hour day, sitting for up to six hours out of an eight hour day; with minimal stooping, crouching, crawling, climbing, and twisting; no workaround [sic] heights, scaffolds, and ladders; with no power gripping, twisting, or pounding with the right-hand [sic]; no overhead work, vigorous pushing, pulling, or extended reaching with he [sic] left upper extremity; performing tasks involving low stress work with minimal industrial standards for production and pace; with minimal changes in the work processes; and with easy access to restroom facilities.

[T. 502-03].

In determining the Plaintiff's RFC, the ALJ evaluated her physical and mental impairments by employing the procedures set out in Title 20 C.F.R. §§404.1520a, and 416.920a.  Id.

The ALJ noted that he had carefully considered the entire Record, including the Plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical, opinion, and other evidence.  [T. 503].  The ALJ related that the Plaintiff had asserted that she was disabled due to pain in her left side, a chronic pain syndrome, seizures, depression, and anxiety.  Id.  The

ALJ also noted that the Plaintiff asserted an inability to sit or stand for extended periods of time, a need to rotate positions constantly, and that she experiences chronic pain and fatigue. [T. 504]. The ALJ found that the Plaintiff's impairments could reasonably be expected to produce her alleged symptoms. [T. 506]. He concluded, however, that the Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." Id.

The ALJ concluded that the objective medical evidence was inconsistent with the Plaintiff's claimed symptoms. Id. In reaching that conclusion, the ALJ relied upon the examination report completed by Dr. Cohn, dated November 18, 2004. Id. Dr. Cohn noted that the Plaintiff had reported chronic thoracic pain, left-sided chest pain, and left shoulder pain. Id. The ALJ noted Dr. Cohn's observation that the Plaintiff could heel walk, toe walk, that her gait was normal, her sensory examination was also normal, and that her reflexes were normal in her upper and lower extremities bilaterally. Id. The ALJ also cited Dr. Cohn's observation that the Plaintiff had a normal range of motion in her major joints, and in her spine, and that there was no tenderness to palpation of her cervical, thoracic, or lumbar spine. Id. The ALJ made particular note of Dr. Cohn's assessment that the Plaintiff was overly dramatic in

presentation, and that her pain behaviors during the clinic visit were inconsistent with the objective findings.  Id.

The ALJ also cited to Dr. Achenbach's treatment notes dated July 13, 2005, that the Plaintiff had experienced no seizures since beginning treatment with Tripleptal. [T. 504].  The ALJ referenced Dr. Achenbach's observation that the Plaintiff was in no acute distress, that her station and gait were normal, that her motor examination revealed quite good strength in her upper and lower extremities bilaterally, with normal bulk and tone, that her sensory examination was intact, and that her reflexes were intact and symmetric.  Id.  The ALJ also cited to Dr. Achenbach's treatment notes of June 15, 2006, which were almost one year later, that the Plaintiff was overweight but in "quite good health," that her station and gait were normal, and that her motor examination revealed good strength, with normal bulk and tone.  [T. 505].

In his review of the Record, and its inconsistency with the Plaintiff's subjective complaints of pain, the ALJ cited to Dr. Ruddy's treatment notes of November 14, 2005, in which Dr. Ruddy had noted that the Plaintiff reported exercising very little due to pain, and observed that she was alert and oriented, with no acute distress.  [T. 504].  The ALJ recounted Dr. Ruddy's observation that the Plaintiff's strength and sensation were grossly intact.  Id.  The ALJ also cited to Dr. Ruddy's treatment notes

from March 3, 2006, where the Plaintiff had reported an increase in her back pain, after a nerve block, but that the pain had calmed down and was back to her baseline level. Id. Dr. Ruddy reported that the Plaintiff denied experiencing neurological deficits, denied numbness, weakness, or tingling in her legs, torso, or arms, and that her back was diffusely painful without any specific point tenderness. Id. In addition, the ALJ related Dr. Ruddy's observation that the Plaintiff moved slowly, but with a good range of motion, during that office visit. Id.

Further, the ALJ cited to Dr. Monsein's examination report from December 19, 2005, in which he noted a marked tenderness to palpation with hypersensitivity over the Plaintiff's scar from her previous thoracotomy, but found that the remainder of the Plaintiff's neurologic examination was unremarkable, with a good range of motion in her cervical and lumbar spine. Id. The ALJ also pointed to Dr. Monsein's observation that the Plaintiff's cranial nerves were intact, her reflexes equal and symmetric, with no gross motor sensory deficits identified on examination. Id. The ALJ considered Dr. Monsein's medical opinion that the Plaintiff was impaired by post thoracotomy syndrome, myofascial pain syndrome, and chronic pain syndrome. Id.

Further, the ALJ cited to Dr. Steely's radiology report, which is dated June 20, 2006, in which the Plaintiff was described as having a normal MRI. Id. Additionally,

the ALJ considered the opinions of the State Agency physician assigned to review the Record, and gave those opinions some weight due to their consistency with the overall Record, but did not adopt the opinions entirely because they did not adequately accommodate the effects of the Plaintiff's subjective complaints. Id. The ALJ also noted that he did not give significant weight to the physician's statements in the clinical records, that the Plaintiff had been disabled since 2001, as those statements were based upon reports made by the Plaintiff regarding her medical history and abilities, rather than opinions made by her treating physicians concerning her medical restrictions. Id.

The ALJ also considered the Plaintiff's prior work history, under Title 20 C.F.R. §§404.1529, and 416.929, and found that her earnings record was consistent with part-time, and minimal part-time employment, indicating a lack of interest, or need for full time employment, which he found to reflect that the Plaintiff's underemployment might be unrelated to her impairments. [T. 505-506]. Based upon the above reports, notes, and evaluations, the ALJ concluded that the Plaintiff's subjective complaints were not entirely credible, and that the RFC was consistent with the Record on the whole. [T. 505].

The ALJ further concluded, based upon the testimony of Russell, that the Plaintiff was capable of performing her past relevant work as an optical goods worker, as that employment did not require the performance of work-related activities which were precluded by the claimant's residual functional capacity. [T. 506]. The ALJ further concluded, after comparing the Plaintiff's RFC with the "physical and mental demands" of the work, that the Plaintiff was able to perform the position "as actually and generally performed." Id.

## IV. Discussion

A. Standard of Review. The Commissioner's decision must be affirmed if it conforms to the law, and is supported by substantial evidence on the Record as a whole. See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998). This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra

at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005), citing <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006), quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the

denial of benefits.'"  Vandenboom v. Barnhart, 412 F.3d 745, 749 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996), superceded on other grounds by 42 U.S.C. §404.1535.  Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore,

is deferential, and we neither reweigh the evidence, nor review the factual record <u>de novo</u>. See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

B.    <u>Legal Analysis</u>.  There is no dispute that the ALJ properly limited his decision to the period after the denial of the Plaintiff's previous application for DIB. Accordingly, we evaluate the ALJ's decision for the time period beginning January 5, 2005, which is the day after the Plaintiff's prior applications were denied.  [T. 33]. It is also not disputed that the Plaintiff maintained insured status through June 30, 2005, and therefore, that she must establish disability on or before that date to qualify for DIB. [T. 499].

In support of her Motion for Summary Judgment, the Plaintiff advances the following arguments:

> 1.    That the ALJ failed to consider the medical opinion of Dr. Zeller, who is a pain specialist;
>
> 2.    That the ALJ failed to fully develop the medical record, as he failed to contact Dr. Zeller in order to clarify that doctor's opinion; and

3. That the ALJ erred at Step Four, by failing to consider evidence about the functional requirements for ordinary work settings.

See, Plaintiff's Memorandum in Support ("Plaintiff's Memorandum"), Docket No. 10, at pp. 6-11.

We address each contention in turn.

1. Whether the ALJ Failed to Afford the Proper Weight to the Medical Opinion of Dr. Zeller.

a. Standard of Review. When a case involves a medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight. 20 C.F.R. §§404.1527 and 416.927; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive. See, Forehand v. Barnhart, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997); <u>Pena v. Chater</u>, supra at 908; <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir. 1991); <u>Kirby v. Sullivan</u>, 923 F.2d 1323, 1328 (8th Cir. 1991); <u>Ward v. Heckler</u>, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846-47. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise. <u>Id.</u> As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. See, <u>Piepgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir. 1996), citing <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991). Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion. <u>Id.</u>; <u>Metz v. Shalala</u>, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent" with "the record as a whole." See, 20 C.F.R. §§404.1527(d)(4), and 416.927(d)(4). More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." See, 20 C.F.R. §§404.1527(d)(5), and 416.927(d)(5).

When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments. See, 20 C.F.R. §§404.1527(d)(2)(ii), and 416.927(d)(2)(ii). Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ. See, 20 C.F.R. §§404.1527(e)(1), and 416.927(e)(1).

Where "'other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that

undermine the credibility of such opinions,'" the ALJ may disregard it. See, Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006), quoting Reed v. Barnhart, 399 F.3d 917, 920-21 (8th Cir. 2005)(internal quotations omitted). "While an ALJ's failure to consider or discuss a treating physician's opinion that a claimant is disabled is error when the record contains no contradictory medical opinion, Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998), an ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)." Thompson v. Astrue, 226 Fed.Appx. 617, 621 (8th Cir. 2007).

b.    Legal Analysis. The Plaintiff alleges that the ALJ erred in failing to account for Dr. Zeller's opinion concerning the functional limitations imposed by the Plaintiff's chronic pain syndrome. In response, the Commissioner argues that Dr. Zeller's letter is not a "medical opinion," that it is not clear that she is a "treating physician," that the ALJ was free to disregard the letter, and that, in any case, the ALJ's RFC is consistent with Dr. Zeller's statement that the Plaintiff has suffered a significant decline in function since 2001, such that any error was harmless.

As an initial matter, we find that Dr. Zeller is a treating physician. In her letter dated March 8, 2006, Dr. Zeller states that she treated the Plaintiff with "intercostal

[injections] without long-term benefit." [T. 676]. More than one (1) year later, Dr. Panopoulos' report, which is dated May 7, 2007, and which was received by the ALJ from the Midwest Spine Institute, lists, as part of her treatment plan, that the Plaintiff "continue[s] with Dr. Zeller as previously scheduled." [T. 678]. Dr. Ruddy refers to Dr. Zeller, and the Midwest Spine Institute, on November 27, 2006, [T. 620], May 11, 2007, [T. 612], and July 23, 2007, [T. 727] as the pain specialist treating the Plaintiff. Dr. Monsein also refers to Dr. Zeller in his report dated December 19, 2005. [T. 686]. Therefore, contrary to the Defendant's assertion, Dr. Zeller treated the Plaintiff for her chronic pain, for at least one (1) year. See, Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006)("A 'treating source' is defined as a 'physician * * *' who treats the claimant.").

Having determined that Dr. Zeller was a treating physician, we proceed to ascertain whether her letter of March 8, 2006, is a "medical opinion," which would require the ALJ to specifically address it. Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." See, Title

20 C.F.R. §§404.1527(a)(2), and 416.927(a)(2); see also, Anderson v. Barnhart, 312 F. Supp.2d 1187, 1194 (E.D. Mo. 2004)(physician's statements were a "medical opinion," because the doctor opined that the plaintiff would have intermittent and recurrent symptoms, and directed that the plaintiff could be "up as tolerated").

Merely because a statement emanates from a treating physician does not automatically render that statement a "medical opinion." Congress, and our Court of Appeals, have made clear that, as but one example, a physician's conclusions regarding a claimant's ability to work, or not to work, are not "medical opinions," since the application of the statute is solely within the Commissioner's purview. See, Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008)("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]."), quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); 20 C.F.R. §§404.1527(e)(1), and 416.927(e)(1); Baker v. Barnhart, 457 F.3d 882, 894 (8th Cir. 2006).

Here, Dr. Zeller's letter, which is addressed "To Whom It May Concern," is purely a request for "a predetermination of coverage" for the implantation of a pain-

control device. [T. 676]. While it relates to Dr. Zeller's potential treatment of the Plaintiff through one type of modality, the letter is not directed at observing or evaluating what the Plaintiff is able to do notwithstanding her impairments, nor does it address what her physical or mental restrictions might be, and it fails to provide any assessment as to how the Plaintiff's symptoms are likely to progress. Id. The Plaintiff cites the language in Dr. Zeller's letter, that "[the Plaintiff's] function has declined significantly since having this pain syndrome," as stating a medical opinion. However, that sentence continues as follows: "and [the Plaintiff] desires to return to a more functional life and work." Id. Moreover, the letter does not contain any particulars as to how the Plaintiff's ability to function has declined.

In context, Dr. Zeller's statement about the Plaintiff's decline in function, since 2001, is much more akin to a bald, conclusory statement, than it is to a medical opinion, for no clinical measures are detailed, nor are any other clinical, diagnositic, or prognostic tests disclosed. See, Taft v. Astrue, 2009 WL 1457349 at *2-3, n. 6 (W. D. Okla., May 21, 2009)(physician's opinion that the Plaintiff had unsafe and unsteady gait was a "medical opinion"); Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005)(physician's opinion that the plaintiff could only stand for two (2) hours and sit for four (4) hours in a work day, because of severe chronic pain, was arguably a

medical opinion); see also, <u>Barnett v. Barnhart</u>, 362 F.3d 1020, 1023 (8th Cir. 2004) (where treating physician's reports did not limit the work the claimant could perform and did not opine about the claimant's ability to perform past occupations, or impose any limitations on the claimant, the report was not inconsistent with the ALJ's findings); <u>Mitchell v. Commissioner of Social Security</u>, 330 Fed.Appx. 563, 570 (6th Cir. 2009)("good reasons rule" did not apply to conclusory statement, based only on claimant's self-reports, even though a physician reported the statement); <u>Allen v. Commissioner of Social Security</u>, 561 F.3d 646, 651 n. 3 (6th Cir. 2009)(physician's general statements regarding typical symptoms and limitations of the plaintiff's impairment not a "medical opinion.").

Dr. Zeller's letter does not contain a medical opinion concerning the plaintiff's abilities, does not opine about her physical or mental limitations, but simply encourages a consideration of a particular treatment modality so as to lessen, at least potentially, the Plaintiff's complaints of pain. As a consequence, since the letter was not a medical opinion, as that term is expressly defined in the applicable Regulations, the ALJ was not required to state his reasons for discounting it. See, <u>Chapman v. Barnhart</u>, 87 Fed.Appx. 598, 599 (8th Cir. 2004)(ALJ is not required to summarize all of the medical records), citing <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 n. 3 (8th Cir.

2000), citing, in turn, <u>Black v. Apfel</u>, supra at 386 ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted * * * [and][a]n ALJ's failure to cite specific evidence does not indicate such evidence was not considered.").

Here, the Record before the ALJ was extensive, comprising over eight hundred (800) pages, of which Dr. Zeller's letter comprised by two (2). While it would have been preferable for the ALJ to note the letter's existence, and advise as to why he did not find its contents substantively controlling, he was not under an obligation to cite the letter, much less discuss its contents where, as here, the contents are conclusory, non-diagnostic, and have no close relationship to the Plaintiff's medical prognosis. See, <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 n. 3 (8th Cir. 2000), quoting <u>Black v. Apfel</u>, supra at 386.

Moreover, the ALJ's opinion reflects that he did consider the statements of the Plaintiff's physicians, that the Plaintiff had been disabled since 2001, but afforded those statements no weight because they were based on the Plaintiff's own reports to those physicians. [T. 505]. Here, Dr. Zeller simply reports the same complaints of pain, but does not address why those complaints are not reflected in the Plaintiff's clinical findings that her strength in all extremities, and her neurological findings, are

within normal limits. Accordingly, we find that the ALJ properly considered the medical opinions of record, and we do not recommend a remand of the matter on that ground.[31]

2.    Whether the ALJ Failed to Fully Develop the Medical Record.

The Plaintiff asserts that the ALJ had an obligation to contact Dr. Zeller for additional evidence or clarification, concerning her evaluation of the Plaintiff, and for an assessment of the ways in which the Plaintiff's chronic pain limited her ability to engage in work-related activities. See, Plaintiff's Memorandum, supra at pp. 8-9. In this respect, Social Security Ruling 96-5p provides as follows:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

---

[31]Since we find that Dr. Zeller's letter was not a medical opinion that required the ALJ's specific discussion, we do not address the Defendant's "harmless error" argument. Plainly, a failure to address conclusory statements that do not constitute valid "medical opinions" is not error, and therefore, is plainly harmless. For the same reason, we also do not address the Plaintiff's argument, that the Commissioner is prohibited from attributing an unarticulated rationale to the ALJ for disregarding a medical opinion. See, Plaintiff's Memorandum, at pp. 9-10.

<u>61 F.R. 34471, 34474, 1996 WL 362206</u> (July 2, 1996).[32]

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004)[citation omitted]; see also, <u>Coleman v. Astrue</u>, 498 F.3d 767, 771 (8th Cir. 2007)(citing same).

Nevertheless, "[w]hile the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'"

---

[32]The same result follows from Title 20 C.F.R. §§404.1512(e)(1), and 416.912 (e)(1), which provide as follows:

> When the evidence we received from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions. * * * We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. * * *

Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005), quoting Stormo v. Barnhart, supra at 806; see also, Hacker v. Barnhart, supra at 938 ("The regulations provide that the ALJ should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled."); Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008)(the claimant's failure to provide information as to Step Four, where the claimant bears the burden of proof, "should not be held against the ALJ when there **is** evidence that supports the ALJ's decision.")[emphasis in original].

Put another way, "'an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" Warburton v. Apfel, 188 F.3d 1047, 1051 (8th Cir. 1999), quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."); see also, Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004)(duty to develop the record 'includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular

impairments at issue," and "[i]n this case, there is substantial psychological evidence in the record, from both treating and examining physicians," since "[e]ach of these sources described [the Plaintiff's] functional abilities," and "[a]ccordingly, we conclude that the ALJ's failure to obtain [the therapist's] views does not vitiate the force of the findings he made regarding [the Plaintiff's] functional abilities.")[internal quotations omitted].

Here, we find that the ALJ properly developed the Record on the issue of the Plaintiff's disabilities, particularly in relation to her chronic pain syndrome. As was the case in Strongson v. Barnhart, the Record before us contains substantial evidence from treating and examining physicians, including a heavily developed Record concerning the Plaintiff's complaints of pain. Specifically, there are numerous treatment notes from Drs. Ruddy and Achenbach, who both treated the Plaintiff consistently from 2005 forward on her complaints of pain, her seizures, and her sinus infections, in addition to examination records from three (3) different pain clinic professionals -- Dr. Cohn at MAPS, Dr. Monsein at Abbott Northwestern's Allina Chronic Pain Clinic, and Dr. Panapoulos at the University of Minnesota Medical Center Pain Management Center. As a consequence, we find no basis, on this Record,

to conclude that the ALJ did not fulfil his responsibility to develop the Record appropriately.

Of course, we find the limited number of records from the Midwest Spine Institute to be enigmatic, given the number of medical records that refer to Dr. Zeller for, in addition to Dr. Zeller's letter, the Midwest Spine Institute's records contain only Dr. Panopoulos' examination report. [T. 676-82]. However, we do not find that the ALJ erred in failing to contact Dr. Zeller for more information. The ALJ left the Record open for thirty (30) days after the Hearing date, specifically for the Plaintiff to submit any recent medical records that she believed were relevant to her application. [T. 873]. The Plaintiff took advantage of that opportunity, and supplemented the Record with medical records from Abbott Northwestern, [T. 683], including Dr. Monsein's report, [T. 684-688], and with records from Allina Medical Center Cambridge, [T. 694].

Although the ALJ is required to obtain a sufficient Record, the Plaintiff must prove her case. See, Young v. Apfel, 221 F.3d 1065, 1069 n. 5 (8th Cir. 2000). If the Plaintiff believed Dr. Zeller's records to be essential or, for that matter, of assistance to the ALJ's decision, she had adequate time to provide them. See, Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993)("[I]t is of some relevance to us that the

[plaintiff's] lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about."); Good Face v. Astrue, 2008 WL 4861548 at *13 (D.S.D., November 7, 2008); Owens v. Astrue, 2008 WL 276299 at *3 (E.D. Ark., January 30, 2008)(supplementing the Record "creates a strong inference that, if there had been other medical records of importance from that time period, Plaintiff would also have submitted them[.]").

Further, the Record discloses that the Plaintiff never reported to the Social Security Administration that Dr. Zeller, at the Midwest Spine Institute, was, in fact, her treating physician, but instead, she listed Dr. Rodman, at the Allina Medical Clinic [T.573]; Dr. McAllister, with MAPS [T. 573]; the Abbott Northwestern Hospital [T. 587]; and Drs. Grossbach, [T. 573], Achenbach [T. 581], Hannah, [T. 581], and Ruddy [T. 588], with the Cambridge Medical Center. The Record shows that the ALJ sent letters requesting medical records to MAPS and to the Allina Clinic in Ramsey, Minnesota. [T. 593, 675]. The Record includes medical records from the Cambridge Medical Clinic, the Allina Medical Clinic, and Abbott Northwestern Hospital. Accordingly, we find that the ALJ properly made the appropriate steps toward amassing the medical records that were critical to the Plaintiff's claims.

Moreover, to successfully challenge an ALJ's decision on the basis of an asserted failure to develop the Record, the Plaintiff must demonstrate that the lack of medical records resulted in prejudice. See, Shannon v. Chater, supra at 488. Our Court of Appeals has addressed this point, in detail, in Ellis v. Barnhart, supra at 994. There, the Court found that the plaintiff had not shown prejudice, where she failed to show what records were missing from the Record. Id.

Here, the Plaintiff has vaguely mentioned Dr. Zeller's "treatment notes," but has not disclosed what those treatment notes might contain, or what examinations or evaluations Dr. Zeller might have completed. We find no prejudice, and the Plaintiff has pointed to none, where she has not demonstrated what the allegedly missing records concern, or how they differ from the medical records already of Record. Therefore, the Plaintiff has not satisfied her burden of showing that the ALJ failed to adequately develop the Record, and we find that the ALJ had sufficient evidence to resolve the issue of the limiting effects of the Plaintiff's chronic pain disorder, as that issue impacts upon his Step Four determinations. Accordingly, we do not recommend remanding the matter on this ground.

3.    Whether the ALJ failed to properly consider the Plaintiff's
      ability to perform the Optical Goods Worker position.

The Plaintiff argues that the ALJ failed to consider the requirements of an "ordinary work setting" in determining her RFC, because the "minimal standards" of production and pace, which are listed in the RFC, require an extraordinary work setting. See, Plaintiff's Memorandum, at p. 10-11. We find the argument to be without merit.

During the Hearing, the ALJ asked Russell if any of the Plaintiff's former jobs would still be performable by a person with her detailed RFC. [T. 872]. Russell responded that the best match would be the Optical Goods Worker, because it is a sedentary position. [T. 872-73]. The ALJ then confirmed with Russell that the Plaintiff would have had an opportunity, in her prior work, to learn how to perform in that position. [T. 873]. In his decision, the ALJ specifically found that the Plaintiff was able to perform the position "as actually and generally performed," after comparing her RFC to the "physical and mental demands" of the work. [T. 506]. The ALJ plainly considered the Plaintiff's abilities in the context of a "real world" setting, as required, when determining her RFC, and when determining that the Plaintiff was capable of performing her past relevant work as an Optical Goods Worker.    See,

Forehand v. Barnhart, supra at 988 (8th Cir. 2004).  Accordingly, we do find no basis to remand the ALJ's decision in this respect.

    4.    <u>Whether the ALJ properly found the Plaintiff not entirely credible in her claims of pain symptoms</u>.

    While she does not specifically attack the ALJ's credibility determinations in her Memorandum, the Plaintiff implicitly argues that the ALJ improperly discounted her subjective complaints of pain.

    a.    <u>Standard of Review</u>.  The governing law makes clear that credibility determinations are initially within the province of the ALJ.  See, <u>Dukes v. Barnhart</u>, 436 F.3d 923, 928 (8th Cir. 2006)("Where adequately explained and supported, credibility findings are for the ALJ to make."), quoting <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000), citing, in turn, <u>Tang v. Apfel</u>, 205 F.3d 1084, 1087 (8th Cir. 2000); see also, <u>Driggins v. Bowen</u>, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); <u>Underwood v. Bowen</u>, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, <u>Leckenby v. Astrue</u>, 487 F.3d 626, 632 (8th Cir. 2007)("We do not reweigh the evidence presented to the ALJ, and we defer to the ALJ's determinations regarding the credibility of testimony, as long as these determinations are supported by good

reasons and substantial evidence."), citing <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 894 (8th Cir. 2006); see also, <u>Stout v. Shalala</u>, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, <u>Eichelberger v. Barnhart</u>, supra at 590 ("The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints."); <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738 (8th Cir. 2004); <u>Shelton v. Chater</u>, 87 F.3d 992, 995 (8th Cir. 1996); <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Ricketts v. Secretary of Health and Human Services</u>, 902 F.2d 661, 664 (8th Cir. 1990). These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ. See, <u>Johnson v. Secretary of Health and Human Services</u>, 872 F.2d 810, 814 n. 3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by <u>Polaski v. Heckler</u>, supra, and its progeny. See, e.g., <u>Flaherty v. Halter</u>, 182 F. Supp. 2d 824, 829 (D. Minn. 2001); <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir.

1996); <u>Shelton v. Chater</u>, supra at 995; <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir.

1996). Factors which the ALJ must consider, in the evaluation of the Plaintiff's

subjective symptoms, include the Plaintiff's prior work record and the observations

of third parties, and of physicians, concerning:

> 1.      the claimant's daily activities;
>
> 2.      the duration, frequency, and intensity of the pain;
>
> 3.      precipitating and aggravating factors;
>
> 4.      dosage, effectiveness and side effects of medication;
>
> and
>
> 5.      functional restrictions.

<u>Polaski v. Heckler</u>, supra at 1322; see also, <u>Gonzales v. Barnhart</u>, supra at 895 (listing
factors for credibility analysis); <u>Choate v. Barnhart</u>, supra at 871 (same).

The ALJ must not only consider those factors, but he must list them and explain the

resolution of any demonstrable conflict or inconsistency in the Record as a whole.

See, <u>Jones v. Chater</u>, supra at 826; <u>Delrosa v. Sullivan</u>, 922 F.2d 480, 485 (8th Cir.

1991); <u>Carlock v. Sullivan</u>, 902 F.2d 1341 (8th Cir. 1990). "However, the ALJ need

not explicitly discuss each Polaski factor." <u>Eichelberger v. Barnhart</u>, supra at 590,

citing <u>Strongson v. Barnhart</u>, supra at 1072. "The ALJ only need acknowledge and

consider these factors before discounting a claimant's subjective complaints." <u>Id.</u>

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them. See, Ostronski v. Chater, supra at 418; Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994) (ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [claimant's] subjective pain complaints are not credible in light of objective medical evidence to the contrary.'" Gonzales v. Barnhart, supra at 895, quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)[internal citation omitted].

It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. See, Simonson v. Schweiker, 699 F.2d 426, 429 (8th Cir. 1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally

deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983), quoting,

Landess v. Weinberger, 490 F.2d 1187, 1190 (8th Cir. 1973). Given this variability,

an ALJ may discredit subjective complaints of pain only if those complaints are

inconsistent with the Record as a whole. See, Taylor v. Chater, 118 F.3d 1274, 1277

(8th Cir. 1997); Johnson v. Chater, supra at 947.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the

Polaski factors in any given Record, which could justify an ALJ's credibility

determination with respect to a Plaintiff's subjective allegations of debilitating

symptoms, is multi-varied. For example, an individual's failure to seek aggressive

medical care militates against a finding that his symptoms are disabling. See,

Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995); Barrett v. Shalala, supra

at 1023; Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988). By the same token,

"[i]nconsistencies between subjective complaints of pain and daily living patterns may

also diminish credibility." Pena v. Chater, supra at 908; see also, Lawrence v. Chater,

107 F.3d 674, 676-77 (8th Cir. 1997) (ALJ may discredit complaints that are

inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996);

Shannon v. Chater, supra at 487. Additionally, evidence of a Plaintiff's symptom

exaggeration can also diminish her credibility on subjective complaints of pain. See,

Sanchez-Wentz v. Barnhart, 216 F. Supp.2d 967, 975 (D. Neb. 2002); Gonzales v. Barnhart, supra at 895; Jones v. Callahan, 122 F.3d 1148, 1151-52 (8th Cir. 1997), citing Jenkins v. Bowen, 861 F.2d 1083, 1086 (8th Cir. 1988).

b. <u>Legal Analysis</u>. In assessing the Plaintiff's complaints of pain, the ALJ properly applied the two-step process, by which he first determined whether there was an underlying physical or mental impairment that could reasonably be expected to produce the Plaintiff's pain, and second, whether the intensity, persistence, and limiting effects of the symptoms, would limit the Plaintiff's ability to do basic work activities. In making that assessment, when the Plaintiff's statements were not substantiated by objective medical evidence, the ALJ properly applied the Polaski factors. [T. 503-506]. Guided by Polaski, and its progeny, the ALJ found significant inconsistencies between the Plaintiff's subjective complaints, and the Record as a whole. In particular, the ALJ found the Plaintiff's credibility, as to the severity of her impairments, to be undermined by her medical records, by the observations of her treating and examining physicians, and by her past work history.

Notably, the ALJ acknowledged the Plaintiff's subjective claims of severe pain in her left torso, and he formulated the Plaintiff's RFC giving recognition to those claims, so as to exclude overhead work, vigorous pushing, pulling, or extended

reaching with her left upper extremity.  [T. 504-05].  However, in discounting the Plaintiff's assertions concerning the severity of her symptoms, as well as finding that the complaints did not render the Plaintiff completely disabled, the ALJ referenced the medical evidence of Record, which was inconsistent with the Plaintiff's assertions. Specifically, the ALJ noted that the Plaintiff consistently tested normal in her range of motion and strength examinations, as well as in her neurological examinations.  [T. 504].

In addition, the ALJ relied upon Dr. Cohn's opinion of November 18, 2004, that the Plaintiff was overly dramatic in her presentation of pain, and that her pain behaviors were inconsistent with Dr. Cohn's observations during his examination, which suggested exaggeration.  Id.  The ALJ also relied upon Dr. Monsein's observation of December 18, 2005, that the Plaintiff exhibited hypersensitivity in the area of her scar from her previous thoracotomy, but that all the tests were normal.  Id. Further, the ALJ took account of the Plaintiff's report to Dr. Ruddy, on March 3, 2006, that following a nerve block, she had experienced a short-term elevation of her pain, but that the pain had returned to baseline, and she had not experienced any neurological deficits, as well as Dr. Ruddy's notation, that the Plaintiff's back was diffusely painful, without any specific point of origin.  Id.

Examining the medical evidence related to the effects of the Plaintiff's mental impairments of anxiety and depression, the ALJ noted that Dr. Panopoulos found the Plaintiff's GAF to be between 50 and 55, indicating moderate psychological symptoms. The ALJ also noted Dr. Achenbach's observation, in her treatment notes of June 15, 2006, that the Plaintiff's attention and concentration were diminished, but that Dr. Panopoulos had reported that the Plaintiff's attention and concentration were intact in clinical notations from May 22, 2006, and Dr. Achenbach had observed the Plaintiff's attention and concentration were normal in her treatment notes of July 13, 2005, which was just two (2) weeks after the Plaintiff's eligibility for DIB expired. [T. 502]. Regarding the Plaintiff's social relationships and social functioning, the ALJ also considered the Plaintiff's reports to Dr. Panopoulos, that she lived with her parents, her son, and her fiancé, and that she did not disclose any significant difficulties in getting along with them. Id. The ALJ also cited to Dr. Panopoulos' report that the Plaintiff was "delightful" and "cooperative," and that the Record did not reflect that the Plaintiff had any significant difficulty in getting along with other people. Id.

Lastly, the ALJ noted that, even prior to her 2001 surgery, the Plaintiff had not consistently sustained full-time employment, suggesting that her medical issues might

not be the reason why she was not currently working.  Id.  Given the foregoing, we find and conclude that the ALJ properly discredited the full extent of the Plaintiff's subjective complaints of symptoms and pain.

The ALJ also properly disregarded references in the medical records which purported to say that the Plaintiff had been disabled since 2001, as those statements were based upon the Plaintiff's report, and not upon the physician's clinical observations.  Id.  Further, the ALJ properly discounted the opinions of the State physicians, and instead, relied upon the Plaintiff's subjective complaints in formulating her RFC, although not accepting those complaints to their full extent.  [T. 505].  With respect to the effects of the Plaintiff's medications, the ALJ concluded that the Record did not demonstrate that the Plaintiff had reported any ongoing long-term side effects from her medications, and so he did not adjust her RFC for such side effects.[33]  Id.  In regards to the Plaintiff's claim that her seizure disorder was disabling,

_____

[33]We note that the ALJ did not specifically address the treatments and medications the Plaintiff was prescribed for her chronic pain.  Our Circuit case law demonstrates that long-term treatment with narcotics is objective medical evidence. See, O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003) ("[W]e have stated that 'consistent diagnosis of chronic * * * pain, coupled with a long history of pain management and drug therapy,' was an 'objective medical fact' supporting a claimant's allegations of disabling pain."); Luce v. Astrue, 523 F. Supp.2d 922, 938 (S.D. Iowa, 2007)("Plaintiff's utilization of several types of prescription pain (continued...)

the ALJ observed that the Plaintiff had suffered no seizures since starting treatment with Trileptal, and that her seizure disorder was under control, and not disabling. Id.

As a consequence, our review of the Record, and of the ALJ's decision, discloses that the ALJ adequately fulfilled his obligation to thoroughly parse the Record, and provide a reasoned explanation for his believability findings. Here, the ALJ's decision demonstrates that he properly considered the entirety of the Record, including the objective clinical findings, and the opinions of the physicians and

---

[33](...continued)
management, including narcotic pain medication, spinal epidurals, and a TENS unit, is objective medical evidence[.]").

However, as noted in the text of this Report, the ALJ is not required to specifically discuss each Polaski factor, nor is the ALJ required to discuss each piece of evidence. Here, the ALJ's decision demonstrates that he considered the Plaintiff's medications, in that he determined that her seizure disorder was controlled by the Trileptal, and that she was not experiencing any long-term side effects from her medications. Moreover, the Plaintiff's treatment with narcotics, while, in one sense, may detract from the ALJ's decision, it does not support any contention that the ALJ's decision is unsupported by substantial evidence. Indeed, the medical records demonstrate that the Plaintiff was prescribed Percocet and Vicodin for a variety of ailments, including tooth pain, [T. 202 and 263], sinusitis [T. 276 and 420] and a bruised hand [T. 643], in addition to her chronic pain, indicating that the treatment of her chronic pain with narcotics was not specific to that impairment. In addition, there is ample evidence in the Record that some of the treatment with narcotics may have been induced by durg-seeking behavior on the Plaintiff's part.

psychologist, as well as the Plaintiff's work history, in discounting the Plaintiff's claims. See, Choate v. Barnhart, supra at 871.

We do not suggest that the Record was devoid of evidence which supported some of the Plaintiff's subjective complaints, but "[w]e will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain," or incapacitation, simply because, in the first instance, we might have reached a different assessment. Gonzales v. Barnhart, supra at 895, quoting Goff v. Barnhart, supra at 792, quoting, in turn, Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, "[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record." Ramirez v. Barnhart, supra at 581; see also, Estes v. Barnhart, supra at 724, citing Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). Since we find no basis to reverse the Plaintiff's credibility rulings, we reject that implicit challenge to the ALJ's determination as without merit.

5. Whether the ALJ's Decision is Supported by Substantial Evidence.

We also read the Plaintiff's objections as urging that substantial evidence fails to support the ALJ's decision. As a preliminary matter, we note the Social Security Administration policy, that a prior decision denying Social Security Disability Benefits does not give rise to a presumption of a continuing condition of nondisability. See, Social Security Acquiescence Ruling 97-4(9), 1997 WL 742758 at *2 (December 3, 1997)(adopting the Ninth Circuit's contrary holding, as to States in the Ninth Circuit, but clarifying that "[t]he SSA does not adopt findings from the final determination or decision on the prior disability claim in determining whether the claimant is disabled with respect to the unadjudicated period.").

Here, the ALJ admitted into the Record all of the evidence submitted for the previous determination. However, the ALJ acknowledged that he was reviewing a unique time period, and his RFC differs from that of the previous ALJ. We find that the ALJ appropriately considered the evidence of Record from the prior application, but did not improperly impose a presumption of non-disability. See, Pirtle v. Astrue, 479 F.3d 931, 934 (8th Cir. 2007)("We have previously found that the ALJ may consider all evidence of record, including medical records and opinions dated prior

to the alleged onset date, when there is no evidence of deterioration or progression of symptoms."), citing <u>Vandenboom v. Barnhart</u>, supra at 750.

Following our close review of the Record, we find that substantial evidence supports the ALJ's decision that the Plaintiff was not totally disabled as of June 30, 2005, or thereafter, through the date of the ALJ's decision. The Record demonstrates that the Plaintiff has an impairment from a seizure disorder but, as of the ALJ's decision, she had not experienced any seizures since beginning medication for the disorder in 2003. The Record also demonstrates that the Plaintiff's mental impairments were not disabling, in that her attention, concentration, affect, memory, and language, were consistently normal, that she was consistently oriented to person, place, and time, during her visits with her health care professionals, and that she did not report significant problems getting along with others.

In relation to the Plaintiff's chronic pain, the Record contains ample clinical observations from her medical sources that she retained a full range of motion in her joints, with good strength in her extremities, and with no neurological deficits. The evidence demonstrates that the Plaintiff was examined by a number of physicians, and was determined by each physician to have good musculoskeletal and neurological examination results. In all of the records which make a note of the matter, the

physicians found that the Plaintiff's station or gait were normal. Dr. Achenbach observed that the Plaintiff was in "quite good health," and exhibited "quite good strength" in her examinations. In addition, Dr. Cohn, a pain specialist, observed that the Plaintiff's pain behaviors were inconsistent with his examination, suggesting that the Plaintiff exaggerated her pain symptoms.

Further, there is no evidence, in the treatment notes from and after January 5, 2005, that the Plaintiff's physicians advised the Plaintiff to limit her activities, and in fact, Dr. Ruddy discussed exercise with the Plaintiff, which she, herself, ruled out. [T. 628]. See, Choate v. Barnhart, supra at 870; cf., Smith v. Barnhart, 435 F.3d 926, 930-31 (8th Cir. 2006)(physicians' direction not to use the stove or drive for one year indicated that they may have believed the plaintiff was limited in her ability to work as well).

We have also considered the evidence of Record concerning the Plaintiff's treatment, and her prescriptions for pain medications, and particularly narcotics. While this treatment tends to support the Plaintiff's subjective claims of debilitating pain, the Record also reflects the opinions, and concerns, of the Plaintiff's physicians that she was engaged in drug-seeking behavior, due to a narcotics addiction. Specifically, Dr. Monsein diagnosed the Defendant with drug abuse, and noted her

"overt seeking behavior" at one appointment. [T. 684]. Dr. Ruddy's treatment notes reflect that he spoke to the Plaintiff concerning her requests for prescriptions, and stated that she would need to see her pain specialist for prescription pain medications. [T. 612]. Dr. Cohn also recommended that the Plaintiff be evaluated for addiction tendencies, and opined that she would not be a good candidate for opioid treatment. [T. 600]. Further, as previously noted, the Record demonstrates that the Plaintiff was prescribed narcotics for a variety of ailments.

This evidence detracts from the Plaintiff's subjective claims of pain, and therefore, we do not find that the evidence of the Plaintiff's medication treatments undercut the validity of the ALJ's decision, such that it is not based on substantial evidence of Record. See, Booker v. Astrue, 2009 WL 1886134 at *38 (D. Minn., June 30, 2009)("A claimant's misuse of medications is a valid consideration in an ALJ's credibility determination and drug seeking behaviors can discredit a plaintiff's allegations of disabling pain."); Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995); Maynard v. Astrue, 2009 WL 73450 at *5 (W.D. Mo., January 8, 2009).

The ALJ's decision is also supported by the medical opinion evidence of Record. While we are aware that the State Agency physician reports were submitted for the previous application, but we do not find those opinions to be outdated, as the

medical records which post-date the earlier decision "indicate similar complaints and assessments," and do not "demonstrate a marked change for the worse" in the Plaintiff's health. See, <u>Bracey v. Astrue</u>, 2009 WL 86572 at *3 (E.D. N.C. January 6, 2009); see also, <u>Frankl v. Shalala</u>, 47 F.3d 935, 939 (8th Cir. 1995)(records indicating the plaintiff was recovering well were outdated, where medical records from one year later indicated deterioration); <u>Williams v. Barnhart</u>, 2002 WL 31185864 at *5 (D. Minn., September 30, 2002)(ALJ erred in not obtaining more recent medical records, where the record showed "major changes in [the plaintiff's] circumstances").

Here, there is no significant change in the Plaintiff's circumstances. The Plaintiff complained of limitations in her ability to shower, to dress herself, and to perform her daily chores or maintain her own home, as well as a need to constantly change positions, in her Activities of Daily Living Questionnaires, completed on December 4, 2002, and March 8, 2003, which she submitted in support of her first application. [T. 148, 149, 151, 152, 153, 169]. She reported her limitations in grooming and bathing, and that her mother did all of the housecleaning and grocery shopping, in her Reconsideration Report, dated March 17, 2003, which she also submitted to support her first application. [T. 173]. In her Disability Report submitted for her second application, although stating her pain was worse, the Plaintiff

repeated substantially similar limitations -- that grooming and bathing were very difficult, that she was not able to clean or shop, and that she was often unable to get dressed.  [T. 586].

In addition, the Plaintiff's treatment for her chronic pain is consistent throughout the Record.  She was prescribed a TENS unit, and Percocet, for her thoracic pain as early as June 5, 2001, [T. 246], and the Record does not demonstrate a consistent increase in dosage.  The Record demonstrates that she was first prescribed Flexeril on April 19, 2001, with consistent prescriptions thereafter.  [T. 161].  During her testimony at the first Hearing on August 14, 2004, the Plaintiff testified she used a TENS pain-control device frequently, [T. 43], and received injections for pain, [T. 43].  While Dr. Zeller's letter reflects she was considering a surgical option to implant a pain control device, the letter also demonstrates that the discussions were in their preliminary stages, and the Record shows that the Plaintiff was already using a TENS device to provide electronic stimulation.  Accordingly, the opinions of the State physicians, from the first application, were not outdated, the ALJ properly considered them, and they support the ALJ's finding that the Plaintiff was not disabled as of June 30, 2005, or any time thereafter.  [T. 325-52].

The ALJ's decision is also supported by the testimony of Medical Expert, Dr. Paul Gannon, who testified at the first hearing on August 12, 2004, that the Plaintiff's abilities were limited to a sedentary occupation because of her persistent pain, with minimal stooping, and occasional lifting of ten pounds. [T. 68]. Dr. Gannon's opinion is also not outdated, as it was given only ten (10) months before the end date of the Plaintiff's insured status, and there is no evidence of any significant change.

Further, based upon an accurate hypothetical posed by the ALJ, Russell testified that the Plaintiff had the ability to resume her prior employment as an Optical Goods Worker, which is a sedentary position, and which is one that she was already familiar with, having worked in the position for a total of four (4) years. [T. 872-73]. Russell also testified that there were "a couple thousand" Optical Goods Worker positions in Minnesota. [T. 873].

In sum, we find that the ALJ's decision that, on and after June 30, 2005, the Plaintiff had the residual functional capacity to return to her previous work as an Optical Goods Worker, was supported by the substantial medical and professional evidence on the Record as a whole. Therefore, finding no error in the ALJ's decision, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Cross-Motion be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No.  9] for Summary Judgment be denied.

2.      That the Defendant's Motion [Docket No.  12] for Summary Judgment be granted.


Dated: December 18, 2009                    *s/Raymond  L.  Erickson*
                                             Raymond L. Erickson
                                             CHIEF U.S.  MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **January 1, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **January 1, 2010**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.